2021 UT App 8

## THE UTAH COURT OF APPEALS

JEREMY THOMAS,
Appellant,
*v.*
JODY TASKER THOMAS,
Appellee.

Opinion
No. 20190242-CA
Filed January 22,2021

Fourth District Court, Nephi Department
The Honorable Anthony L. Howell
No. 114600077

Rosemond G. Blakelock and Megan P. Blakelock,
Attorneys for Appellant

Todd F. Anderson, Attorney for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Jeremy Thomas appeals the district court's order following a January 10, 2019 hearing, in which it held him in contempt and imposed various sanctions. We affirm but remand for a calculation of fees and costs on appeal.

### BACKGROUND

¶2 Jeremy and Jody Tasker Thomas were divorced in 2013. The parties have two children: Son and Daughter. The divorce decree provided that during the school year, Jeremy would have primary custody of Son and Jody would have primary custody of Daughter. The parties were to share joint physical custody of the children during the summer. Since their divorce, the parties

have had numerous conflicts regarding the children, which ultimately led the parties to stipulate to appointment of a special master to help them resolve their parenting disputes. With respect to establishing an order governing the special master's authority (Order Appointing Special Master), the parties stipulated to use the "standard Special Master Order as used by Jay Jensen or Sandra Dredge."[1]

¶3     The special master issued numerous orders in the years following his appointment. For example, he issued orders governing the children's communication and cell phone use during parent-time and requiring both the parents and children to participate in therapy. He also issued orders outlining procedures for exchanges for parent-time that were intended to minimize conflict and prevent the children from defying the parent-time schedule.

¶4     Four years after the decree was entered, Jody filed a motion for order to show cause in which she alleged that Jeremy had violated various provisions of the parties' divorce decree and the special master's orders. These allegations revolved around one primary issue: that Jody believed Jeremy was alienating the children from her by speaking "derogatorily or disparagingly" about Jody, "[p]utting the children in the middle," "discussing adult issues with the children," and denying her parent-time.

¶5     The district court held a hearing on Jody's motion for order to show cause, as well as various other pending motions, in November 2017. With respect to Jody's motion, the court

---

1. Although details about Jay Jensen and Sandra Dredge are not found in the record, we take judicial notice, purely for the purpose of providing background information, that the former is a therapist and the latter an attorney. Both have practices in Utah County and have served as special masters in several domestic cases there.

found that Jeremy was "using the teenager[s'] busy schedules as a way to triangulate animosity and contempt of the children against their mother," that his actions made Jody out to be the "bad guy," and that he had "shown a continued pattern towards alienating the love and affection of the children towards" Jody. The court also found that Jeremy had not complied with an order of the special master that he "engage in individual therapy."

¶6     Based on these findings, the court concluded that Jeremy had violated provisions of the divorce decree as well as "multiple orders of the Special Master," that Jeremy knew of the orders, that he had the ability to comply, and that he willfully refused to do so. As a result, the court found him in contempt and ordered sanctions of thirty days incarceration in county jail, suspension of any licenses issued by the state, and a $1,000 fine (the First Contempt Order). However, the court stayed the sanctions and gave Jeremy an opportunity to purge the contempt by doing four things: (1) "fully comply[ing] with the Special Master order(s) regarding counseling"; (2) "mak[ing] progress regarding his alienation of the children"; (3) "provid[ing] necessary releases for [his therapist] to provide regular reports to the Special Master and [Jody] regarding [Jeremy's] progress"; and (4) paying Jody's attorney fees and costs relating to several motions. The court then set the matter for further review. At the subsequent hearing, the court did not consider whether Jeremy had purged his contempt, but it ordered Jeremy:

> 1. To strictly comply with the Custody order.
>
> 2. To make no alterations or changes to the custody order without the prior agreement of [Jody].
>
> 3. To compel the children to comply with the custody order, and to do so without any further alienation of the children.

4. To not schedule or allow to be scheduled any activity with the children in conflict with the custody order.

5. To not allow [Son's] sports and motocross to interfere with [Jody's] visitation without [Jody's] agreement to a trade.

6. To compel [Son] to comply with the custody order.

7. To not allow the children to refuse to comply with the custody order.

¶7 As the year progressed, tensions between the parties continued. Several contentious issues arose relating to exchanges of the children, in which Jeremy "fail[ed] to ensure the children attend parent-time." Although Jeremy would take the children to the exchange location, the children would refuse to go with Jody, and Jeremy would then allow them to go home with him. Additionally, when conflicts arose between Son's extracurricular activities and his parent-time with Jody, Jeremy left it to Son to coordinate scheduling changes and make-up time with Jody, putting the full responsibility of disappointing Son on Jody if changes to the schedule could not be arranged.

¶8 Then, at some point in the summer of 2018, Daughter hatched a plan that would allow her to move in with Jeremy during the school year. She informed Jeremy that Jody had given her permission to register for school in Jeremy's district. Without verifying this information with Jody, Jeremy went to the school and pre-registered Daughter to attend school where he lived. When it became apparent that Jody had not given permission for Daughter to change schools, Daughter "refused to go to school for a considerable time" in the hope that "if [she] didn't go to school, they'd let [her] go to [her] dad's." Additionally, Daughter made attempts to harm Jody, which culminated in Daughter

being placed in juvenile detention and referred to the Utah Juvenile Court system.

¶9     Jody filed another motion for order to show cause in December 2018, in which she alleged that Jeremy had failed to purge his contempt and that he should additionally be held in contempt for failing to obey a subpoena and for violating numerous orders of the court and special master. The district court held an evidentiary hearing on the motion on January 10, 2019, and again found Jeremy in contempt (the Second Contempt Order). In light of the voluminous evidence relating to Jeremy's alienation of the children submitted to the court at that hearing and throughout the pendency of the case, the court made findings regarding anecdotal incidents that it believed were representative of the alienating behavior.

¶10    First, the court recited text messages from an incident in February 2018 in which Daughter refused to return to Jody's home after parent-time with Jeremy and Jeremy supported her refusal. It then addressed an incident in July 2018 in which Jeremy "knew the children did not want to do" parent-time with Jody and "failed to do anything to encourage or ensure the children comply with [Jody's] parent-time as required by the orders of the Court." The court found that this conflict was "only one example of many where [Jeremy] failed to encourage and/or compel the children's compliance with" Jody's parent-time.

¶11    The court also made several findings regarding the school incident. The court found that either (1) Jeremy was lying to the court when he claimed Daughter told him Jody gave permission for her to "look at enrolling and attending school" in Jeremy's district or (2) Daughter lied to Jeremy and Jeremy made no attempt to communicate with Jody to verify Daughter's "unbelievable statement that she had [Jody's] permission." The court found that "as a result of [Jeremy's] failure to act, [he] implanted the idea into [Daughter's] mind that [he] was going to aid [her] in her plot to" live with Jeremy: "[T]he best-case scenario is that [Jeremy] was complicit with [Daughter's] lies and plans. The worst-case scenario is that [Jeremy] helped

[Daughter] orchestrate her plot and is lying to the Court." The court found that Jeremy's "willingness to allow [Daughter's] defiance" was a "significant contributor" to her "pushing the envelope of her defiance" by "refusing to attend school for many weeks" and attempting to harm Jody.

¶12   Moreover, the court adopted as part of its order findings of fact submitted by the special master on December 18, 2018, and January 4, 2019. The special master found that although "there was an added measure of compliance" by Jeremy following the First Contempt Order, noncompliance escalated during the late summer and early fall of 2018 and Jeremy had "failed to demonstrate strict and consistent compliance with the custody order." The special master's findings went on to detail various incidents of parent-time conflicts and noncompliance by Jeremy, as well as how Jeremy's failure to respond to the special master and comply with his orders had impeded the special master's investigation of various incidents and allegations.

¶13   The special master also found that although Jeremy had attended ten sessions with his therapist following the First Contempt Order, he had not met with the therapist for the nine months prior to the January 2019 hearing. However, apart from observing that the therapist appeared not to have a full understanding of the situation, the court did not make additional findings regarding Father's compliance with orders that he attend therapy.

¶14   The court determined that "the alienation of the children . . . is the most critical issue that the Court has taken into consideration." It therefore found Jeremy "in continued contempt as [he] has failed to purge his contempt previously found, and also continued to violate the same orders," including provisions of the divorce decree regarding alienation and putting the children in the middle, as well as "multiple orders of the Special Master."

¶15   As a result of its contempt findings, the court ordered the following sanctions: (1) that Jeremy pay all Jody's attorney fees

and costs "incurred in relation to this case and her difficulty in co-parenting since February 3, 2018"; (2) that Jeremy pay all the special master "fees and costs incurred since November 14, 2017"; (3) that Jeremy pay for "all uninsured costs of counseling for the parties' minor children" as well as for individual treatment for Jody and Jeremy with the family counselor; (4) that all parent-time and communication between Jeremy and Daughter be supervised until the special master makes findings that the alienation issues have been sufficiently addressed; (5) that custody of Son be changed from Jeremy to Jody and all parent-time and communication between Jeremy and Son be supervised; and (6) that the stay on two days of the thirty-day jail sentence imposed in the previous contempt order be lifted and that Jeremy serve those two days in the Juab County Jail. However, the court stayed the sanction changing custody and instituting supervised parent-time of Son conditioned on Son strictly complying with court-ordered parent-time and Jeremy showing "a good faith effort to ensure that the minor children are repairing their relationships with [Jody]."

¶16    Custody of Son never actually changed, and the parties reached a stipulation in July 2019 in which they agreed that "[c]ustody of [Son] shall remain [with Jeremy] based on the recommendation of the Special Master, who believes that [Jeremy] has (as of the date of the signing of this Stipulation) been in sufficient compliance with" the conditions imposed by the court in the Second Contempt Order. Son turned eighteen in August 2020.

¶17    Jeremy now challenges the Second Contempt Order on appeal.

ISSUES AND STANDARDS OF REVIEW

¶18    First, Jeremy claims that the district court violated rule 53 of the Utah Rules of Civil Procedure by treating the special master's orders as orders of the court, the violation of which could justify a contempt finding. "The proper interpretation of a

rule of procedure is a question of law, and we review the trial court's decision for correctness." *American Interstate Mortgage Corp. v. Edwards*, 2002 UT App 16, ¶ 10, 41 P.3d 1142 (quotation simplified).

¶19 Second, Jeremy raises several issues relating to the district court's contempt findings and sanctions: (1) that the court exceeded its discretion in concluding that he had not purged his prior contempt found in the First Contempt Order, (2) that the court exceeded its discretion in finding him in further contempt of the court's orders, (3) that the court lacked authority to change the custody of Son as a sanction for his contempt when no petition to modify was pending in the case, and (4) that other sanctions were inappropriate. "An order relating to contempt of court is a matter that rests within the sound discretion of the trial court." *Dansie v. Dansie*, 1999 UT App 92, ¶ 6, 977 P.2d 539. Moreover, "we overturn a sanction only in cases evidencing a clear abuse of discretion." *Chaparro v. Torero*, 2018 UT App 181, ¶ 20, 436 P.3d 339 (quotation simplified). "An abuse of discretion may be demonstrated by showing that the district court relied on an erroneous conclusion of law or that there was no evidentiary basis for the trial court's ruling." *Id.* (quotation simplified).

ANALYSIS

I. Special Master Orders

¶20 Rule 53 of the Utah Rules of Civil Procedure states that "[a]ny or all of the issues in an action may be referred by the court to a master upon the written consent of the parties." Utah R. Civ. P. 53(a). Regarding the powers of a special master, the rule states that "[t]he order of reference to the master may specify or limit [the master's] powers." *Id.* R. 53(c).

¶21 A special master was appointed in this case based on the parties' stipulation, in which they agreed to give the master authority in accordance with "[t]he standard Special Master Order as used by Jay Jensen or Sandra Dredge." The Order

Appointing Special Master grants the special master authority to issue "directives" regarding numerous specified issues such as scheduling, communication, and therapy and specifies that these directives "are effective as orders when made and . . . continue in effect unless modified or set aside by a court of competent jurisdiction." The Order Appointing Special Master also grants the special master the authority to issue "recommendations" on other specified issues, such as significant changes to parent-time or conflicts on fundamental parenting decisions relating to healthcare, religion, and education. It states that recommendations—unlike directives—do not become court orders unless and until the district court adopts them.

¶22 Jeremy first asserts that the district court erred in determining that "all the Special Master 'Orders' issued" as of the January 10, 2019 hearing "are 'directives'" under the Order Appointing Special Master, because the court did not "examin[e] the subject matter contained in each pleading the Special Master filed." However, Jeremy provides no support for his assertion that the district court did not examine the subject matter of the individual special master orders. Further, he makes no attempt to point us to orders that should have been considered recommendations rather than directives. Thus, he has not adequately briefed his claim that the district court erred in classifying all the prior special master orders as directives. *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed.").

¶23 Jeremy further asserts that even if the special master orders were directives, they could not have become effective until the district court acknowledged them as such in its Second Contempt Order. But this position is contrary to the plain language of the Order Appointing Special Master, which states that directives "are effective as orders when made and . . . continue in effect unless modified or set aside by a court of competent jurisdiction." The court's acknowledgment that the special master orders were directives is not the event that made

them effective. They were effective and binding at the time the special master issued them, in accordance with the Order Appointing Special Master.

¶24　To the extent that Jeremy challenges the special master's authority to make binding directives under rule 53, such a challenge was previously foreclosed by this court in *Wight v. Wight*, 2011 UT App 424, 268 P.3d 861, in which we rejected a similar argument challenging a district court's ability to grant a special master limited power under rule 53 to make binding decisions on specific issues. *Id.* ¶ 16. While rule 53 does not directly give the special master authority to make binding directives, it gives the court the ability to "specify or limit" the special master's powers in the Order Appointing Special Master. *See* Utah R. Civ. P. 53(c). The parties in this case stipulated to the appointment of the special master and to the Order Appointing Special Master that would be used. The grant of limited decision-making power in an Order Appointing Special Master is permitted under the "considerable discretion" rule 53 grants district courts in using a special master. *See Wight*, 2011 UT App 424, ¶ 16. Thus, the court's acknowledgment of the binding nature of the special master's directives in this case is not contrary to rule 53. As in *Wight*, "nothing in the [Order Appointing Special Master] limited either party's ability to challenge the decisions of the special master by filing objections with the trial court." *Id.* But unless and until such an objection was made and ruled on, the special master's directives were "effective as orders" under the Order Appointing Special Master.

¶25　And while Jeremy asserts that his due process rights were violated when the court treated the directives as orders of the court and held him in contempt for violating them, he has failed to explain why. "At its core, the due process guarantee is twofold—reasonable notice and an opportunity to be heard." *In re adoption of B.Y.*, 2015 UT 67, ¶ 16, 356 P.3d 1215. Jeremy does not assert that he lacked notice of the orders of the special master. Moreover, given that the orders were directives—a

finding that Jeremy has failed to adequately challenge, *see supra* ¶ 22—and that the Order Appointing Special Master clearly informed Jeremy that directives are binding when issued, he should have known that he was required to comply with them. Further, the Order Appointing Special Master gave Jeremy an opportunity to present any grievances regarding the special master's orders to the court by means of an objection. He does not assert that he was somehow precluded from objecting to the special master's orders in the manner prescribed by the Order Appointing Special Master. Therefore, we find no merit in Jeremy's claim that the district court violated his due process rights in holding him accountable for failing to comply with the special master's orders.[2]

## II. Contempt Finding and Sanctions

¶26 Next, Jeremy raises several challenges to the district court's contempt findings and sanctions. We address each in turn.

### A. Failure to Purge Contempt

¶27 Jeremy first asserts that the court exceeded its discretion in finding that he had not purged his prior contempt, claiming that its findings were not supported by the evidence. To purge his contempt, Jeremy was required to do the following four things: (1) "fully comply with the Special Master order(s) regarding counseling"; (2) "make progress regarding his alienation of the children"; (3) "provide necessary releases for

---

2. Even if we were persuaded that the court somehow erred in holding Jeremy in contempt based on the orders of the special master, it is unclear how that would alter the outcome of this case. The court's contempt finding was not based solely on violations of the special master's orders but rested in large part on his violation of those provisions of the divorce decree prohibiting alienation.

[his therapist] to provide regular reports to the Special Master and [Jody] regarding [Jeremy's] progress"; and (4) pay Jody specific attorney fees and costs.

¶28    Jeremy asserts that the district court did not make appropriate findings regarding whether he had purged his contempt. As to the first, third, and fourth requirements imposed by the court, we agree that the district court did not clearly address Jeremy's compliance.[3] However, that fact does not undermine the court's determination that Jeremy had not purged his contempt. To purge the contempt, Jeremy was required to comply with *all four* of the requirements. Thus, his failure on even one of the requirements would support a determination that he had not purged his contempt.

¶29    The court made extensive findings regarding Jeremy's failure to comply with the second requirement—that he make progress on his alienation of the children. Indeed, the court observed that "alienation of the children . . . is the most critical issue that the Court has taken into consideration" in concluding that Jeremy had "failed to purge his contempt." The court's findings regarding alienation were extensive and included detailed recitals of the events relating to contentious exchanges in February and July 2018, as well as the events relating to Jeremy's support of Daughter's scheme to change schools. Further, the court adopted the special master's findings, which recited additional instances of parent-time interference and found that Jeremy had "not made consistent progress with the issues of alienation" and, despite "greater compliance and progress" initially following the First Contempt Order, had

---

3. The adopted findings of the special master did suggest that Jeremy had not "fully compl[ied] with the Special Master order(s) regarding counseling," as he had not met with therapist for the nine months prior to the January 2019 hearing. However, the district court did not analyze Jeremy's compliance with this mandate.

"fallen into old patterns, continuing to impact the children's relationship with" Jody.

¶30 Jeremy does not assert that the evidence could not support these findings but instead reargues the evidence, relying solely on the testimony of his own therapist that Jeremy's progress on alienation issues had been "very good." But the district court discredited this testimony as unreliable because it believed that, "whether intentionally or unintentionally," Jeremy had given the therapist "a grossly distorted history of this case," so the therapist did "not have an understanding of what is actually going on."[4] Further, the court made extensive findings

4. Jeremy does not challenge the court's determination that his therapist's testimony was not credible but instead blames the special master and the district court for any distortion of the facts because the special master selected and the court appointed the therapist to function solely as an individual therapist for Jeremy and not to meet with other members of the family or evaluate the family as a whole. He asserts that if the therapist had been required to consult with others, the therapist would have had a fuller picture of the situation and that the lack of such consultation precluded Jeremy from complying with the court's mandate that he make progress on his alienation issues. But even accepting Jeremy's premise, these facts suggest only that the therapist's lack of information from other sources might have limited his utility as a witness to Jeremy's progress, not that Jeremy was precluded from making progress on his alienation issues. It was Jeremy who continued to make poor decisions by interfering with parent-time, supporting Daughter's scheme to change schools, and generally undermining Jody. And it was Jeremy who, in meeting with the therapist, left out crucial information that could have helped the therapist better understand and help him with the alienation issues. The fact that Jeremy failed to make progress in spite of therapy does not come down to whether the special master or court ordered the therapist to meet with other individuals in the family.

(continued…)

concerning events that demonstrated Jeremy had not made progress on alienation issues. The underlying evidence supports these findings, and in turn, the findings support the district court's determination that Jeremy had failed to purge his contempt.

## B.    Additional Contempt

¶31    Jeremy also asserts that he should not have been held in further contempt, but his arguments in support of this assertion lack merit.

¶32    To find someone in contempt, a court must find "that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988). Here, the court found all three of these elements. Jeremy does not directly challenge the court's findings on these elements[5] but raises related issues that he claims precluded the court from finding him in contempt.

¶33    First, he takes issue with a statement the court made in its findings about a conflict between the parties over a trip to England that had occurred prior to the First Contempt Order. The court's findings regarding alienation in the Second Contempt Order stated that it had "identified, with specificity,

---

(…continued)
Ultimately, it was Jeremy's responsibility to comply with the court's order that he make progress on his alienation issues, and he failed to do so.

5. Jeremy does attempt to challenge the court's findings regarding the school incident, but he does so in the context of challenging the sanctions rather than in the context of challenging the contempt finding. In any event, we reject those arguments as discussed *infra* ¶ 44.

three circumstances that are not the only examples, but typify the behavior [Jeremy] has engaged in that encourages alienation between the minor children and [Jody]." The court then follows this introduction with the statement, "First, during the course of the evidentiary hearing, in the Court's questioning of [Jeremy], the Court brought up the previous canceled trip to England and the findings the Court made regarding that event." Jeremy asserts that it was inappropriate for the court to rely on incidents relating to the England trip to find him in further contempt because those events occurred before the First Contempt Order.

¶34   Admittedly, the inclusion of this statement here is somewhat confusing. Subparagraphs underneath this statement in the court's order proceed to recite the details of the February 2018 parent-time incident and do not again refer to the England trip. In fact, the court does not mention or discuss the England trip beyond the above-quoted language. Moreover, the court goes on to discuss three distinct incidents, apart from the England trip, as examples of Jeremy's alienating behavior—the February 2018 incident, the July 2018 incident, and the incident involving Daughter's schooling.

¶35   Given the complete lack of any further discussion of the England trip and the fact that the court indicated its intent to discuss "three circumstances" that typified Jeremy's behavior, we are inclined to believe that the statement about the England trip was misplaced and that it was the other three incidents, discussed in more detail, that formed the basis of the court's contempt finding. The court made no findings or conclusions relating to the England trip but merely mentioned that it had questioned Jeremy about it. And the other three incidents, in addition to the other incidents identified in the special master's findings, which the court adopted as part of the Second Contempt Order, provided ample support for the district court's contempt finding. Thus, there is no indication in the Second Contempt Order that the court actually placed any weight on the England trip incident when finding Jeremy in further contempt.

¶36 Second, Jeremy asserts that the court's findings improperly relied on certain affidavit evidence provided by Jody that he claims was not appropriately admitted. However, any error by the court in considering that evidence was invited when Jeremy indicated that he had no objection to the court considering affidavits "in lieu of direct testimony, so long as the party is then available for cross examination." *See Pratt v. Nelson*, 2007 UT 41, ¶ 17, 164 P.3d 366 ("A party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." (quotation simplified)). Furthermore, at the evidentiary hearing, Jody reaffirmed the statements in her affidavit, and Jeremy took the opportunity to cross-examine her about them.

¶37 In short, we see no merit to any of Jeremy's arguments challenging the basis for the court's new findings of contempt. Indeed, the evidence of Jeremy's alienating behavior was substantial, and the court's findings were thorough. We do not hesitate to uphold the court's additional contempt findings in the Second Contempt Order.

C.     Change of Custody

¶38 Jeremy next argues that the district court exceeded its discretion by awarding a change of custody of Son as a sanction for his contempt, particularly where no petition to modify was pending. However, this particular sanction was stayed, and the stay was never lifted. Instead, the court entered a new order, pursuant to the parties' stipulation, in July 2019. This order declared that "[c]ustody of [Son] shall remain [with Jeremy] based on the recommendation of the Special Master, who believes that [Jeremy] has (as of the date of the signing of this Stipulation) been in sufficient compliance with" the conditions imposed by the court in the Second Contempt Order. The order went on to indicate that the parties' stipulation "resolves any and all issues related to . . . custody of [Son]." Moreover, Son turned eighteen in August 2020 and is therefore no longer subject to the jurisdiction of the court. *See generally* Utah Code

Ann. § 15-2-1 (LexisNexis 2013) ("The period of minority extends . . . to the age of 18 years . . . ."); *id.* § 30-3-1(5)(d) (2019) (granting district courts jurisdiction over "the custody and maintenance of minor children" in a divorce).

¶39   Because the change-of-custody sanction was never implemented and Son is no longer subject to the jurisdiction of the court, we agree with Jody that this issue is moot. *See State v. Steed*, 2015 UT 76, ¶ 6, 357 P.3d 547 ("An argument is moot if the requested judicial relief cannot affect the rights of the litigants. In other words, an appeal is moot if the controversy is eliminated such that it renders the relief requested impossible or of no legal effect." (quotation simplified)).

¶40   Jeremy nevertheless asks us to review this issue "because it is of wide concern, affects the public interest, is likely to recur, and yet evades review." *See Osguthorpe v. Osguthorpe*, 872 P.2d 1057, 1058 (Utah Ct. App. 1994). But this does not appear to us to be an accurate statement. Indeed, our court has previously addressed this very issue. *See Chaparro v. Torero*, 2018 UT App 181, ¶ 40, 436 P.3d 339 ("A district court cannot avoid making [best interests] findings by modifying custody arrangements as a sanction."); *see also Blanco v. Blanco*, 311 P.3d 1170, 1175 (Nev. 2013) (en banc) ("A court may not use a change of custody as a sword to punish parental misconduct, such as refusal to obey lawful court orders, because the child's best interest is paramount in such custody decisions." (quotation simplified)), *quoted in Chaparro*, 2018 UT App 181, ¶ 40. Thus, the issue is clearly not one that evades review, and it is one on which we have already provided guidance. Accordingly, we decline to consider this moot issue.

D.    Other Sanctions

¶41   Finally, Jeremy asserts that "all sanctions, including attorneys fees, supervised parent-time, and the change of custody should be reversed." However, we reject his arguments on this point because they are inadequately briefed. *State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that

a reviewing court will not address arguments that are not adequately briefed.").

¶42 First, he asserts that attorney fees for "things such as charges on December 17, 2018 regarding mediation discussions with a mediator and charges on July 11, 2018 regarding a separate case involving a Lis Pendens" were unrelated to the order to show cause and therefore should not have been included in the sanctions. This is the extent of his argument. He makes no attempt to explain specifically why these charges were unrelated to the show cause motion or even to identify all the charges he is contesting. Jeremy's limited analysis is inadequate to challenge the propriety of the attorney fees sanction, and we therefore decline to address his argument.

¶43 Apart from Jeremy's minimal discussion regarding the propriety of the attorney fees, he does not challenge the appropriateness of the sanctions. Instead, his argument alleges that the court "failed to make the required findings with respect to contempt." *See generally Marsh v. Marsh*, 1999 UT App 14, ¶ 10, 973 P.2d 988 (explaining that a court cannot hold someone in contempt unless it finds "from clear and convincing proof that the contemnor knew what was required, had the ability to comply, and willfully and knowingly failed and refused to do so" (quotation simplified)). But this argument, too, is inadequate. Jeremy makes two points: (1) that he could not have "willfully refused to allow [Daughter] to attend school" because he did not have custody of her and (2) that Jody "failed to submit any evidence of [his] contempt."

¶44 The first argument is irrelevant because the school issue was not that Jeremy did not allow Daughter to attend but that he, at best, "was complicit with [Daughter's] lies and plans" and, at worst, "helped [Daughter] orchestrate her plot" not to attend school and that his actions exemplified "the behavior [he] has engaged in that encourages alienation between the minor children and" Jody. Moreover, other instances of alienation supported the court's decision to hold Jeremy in contempt for violating provisions of the divorce decree pertaining to

alienation, so even if we agreed with him that the school incident could not support the contempt finding, his failure to specifically challenge the other findings supporting the contempt would preclude us from reversing the court's decision. *Cf. Gilbert v. Utah State Bar*, 2016 UT 32, ¶ 24, 379 P.3d 1247 ("[We] will not reverse a ruling of the district court that rests on independent alternative grounds where the appellant challenges only one of those grounds."). As to his second argument, we have already addressed and rejected it. *See supra* ¶ 36. Thus, we reject Jeremy's challenge to the court's contempt sanctions.

### III. Attorney Fees

¶45    Jody requests her attorney fees and costs on appeal on the ground that she was awarded fees below. "The general rule is that when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Robertson's Marine, Inc. v. I4 Solutions, Inc.*, 2010 UT App 9, ¶ 8, 223 P.3d 1141 (quotation simplified). Although there are exceptions to this general rule, *see, e.g., Liston v. Liston*, 2011 UT App 433, ¶ 27 n.6, 269 P.3d 169, Jeremy has not argued that any exception applies here. Thus, because Jody has prevailed on appeal, we grant her request for fees and costs on appeal and remand for the district court to calculate the award.

### CONCLUSION

¶46    Neither the Order Appointing Special Master nor the court's interpretation and application of that order violated rule 53 of the Utah Rules of Civil Procedure. Further, Jeremy has not adequately alleged any error or abuse of discretion in the court's determination that he had failed to purge his prior contempt and that he had engaged in additional contemptuous acts. Jeremy's challenge to the change-of-custody sanction is moot, and his challenges to the other sanctions are inadequately briefed. Because Jody has prevailed on appeal and was awarded fees below, she is also entitled to fees on appeal. Accordingly, we

affirm the Second Contempt Order but remand for the district court to calculate an award of fees and costs to Jody on appeal.

———————