2021 UT App 119

# THE UTAH COURT OF APPEALS

DALE K. BARKER COMPANY PC CPA PROFIT SHARING PLAN,
Appellee,
*v.*
SHAWN D. TURNER,
Appellant.

Amended Opinon[*]
No. 20200070-CA
Filed November 4, 2021

Third District Court, Salt Lake Department
The Honorable Barry G. Lawrence
No. 180902299

Shawn D. Turner, Appellant Pro Se

Scarlet R. Smith and R. Jesse Davis, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1     Appellant Shawn D. Turner and Appellee Dale K. Barker
Company PC CPA Profit Sharing Plan (the Plan) entered into a
written loan agreement (the Note) on July 30, 2010. The Plan
loaned Turner $25,000, which he was supposed to repay within
sixty days, but Turner failed to make any payments for over four

---

[*] This Amended Opinion replaces the Opinion in Case No.
20200070-CA issued on August 19, 2021. After our opinion
issued, the Appellee filed a petition for rehearing under rule 35
of the Utah Rules of Appellate Procedure, and we called for a
response. We grant the petition for the purpose of addressing the
award of attorney fees on appeal in paragraphs 45 and 46.

years. However, pursuant to an agreement with the Plan's trustee, Dale K. Barker, payments were made on the loan in 2015 and 2017.

¶2      When a lawsuit was brought in 2018 to recover the outstanding balance on the loan, Turner moved for summary judgment on the grounds that the suit was barred by the statute of limitations. The district court denied that motion. It later held a bench trial, concluded that Turner had defaulted on the loan, awarded damages as set forth in the Note, and awarded attorney fees and costs to the Plan.

¶3      Turner appeals, and we affirm.


BACKGROUND

¶4      In the summer of 2010, Turner approached Dale Barker and asked him for a loan. Turner knew Barker through an existing attorney-client relationship: Turner had been performing legal collections work for Barker's company, Dale K. Barker Co. PC Certified Public Accountant (the Company), often on a 33% contingency fee basis. Eventually the loan was agreed upon, with the Plan—as opposed to the Company or Barker himself—as the creditor.

¶5      Turner drafted the Note memorializing the July 30, 2010 loan. Under the terms of the Note, the Plan loaned Turner $25,000, which was to be repaid to the "Note Holder"—the Plan—within sixty days of delivery of the loan proceeds. The Note further specified that it would accrue interest at a "yearly rate of 60.0% simple interest." In the event that Turner failed to pay off the loan within the required sixty days, the Note clarified that, at its discretion and at any time thereafter, the Note Holder could send Turner a written notice demanding that within thirty days he pay the full amount of the principal and interest accrued. Relatedly, the Note also contained a provision allowing for "late charges for overdue payments." (Cleaned up.)

¶6    Turner failed to pay off the loan within sixty days as required by the Note. In fact, Turner made no payments on the Note before it came due. However, the Plan did not immediately send Turner a written notice of default or demand that he repay the debt. In addition, Turner continued to perform legal work for the Company.

¶7    As of February 2015, Turner had still not made any payments on the loan, which had ballooned to approximately $90,000. But during that month, Barker received $120,000 in settlement proceeds from a case that Turner had worked on. This prompted Turner to send Barker an email on February 17, in which he stated,

> As you are aware I am entitled to 1/3 o[f] the settlement. I want to apply all of that to the amount owing under the note to the [Plan]. Is that acceptable?

Later that same day, in response to an email that Barker sent, Turner stated,

> My reference to the 1/3 arrangement was simply, with the intent to let you know that I wanted anything that would come to me to be applied to the debt I owe to the [Plan]. . . . I was simply trying to make clear that I did not expect to receive anything that I would keep out of this upcoming payment.

Barker agreed and applied the one-third of the settlement proceeds to which Turner was entitled toward the outstanding loan. Thus, approximately $40,000 was paid on the loan in February 2015.

¶8    No further payments were made on the loan until November 2017. During October of that same year, Barker received $7,500, in settlement proceeds from another case

that Turner had worked on. Pursuant to the agreement reached in February 2015, Barker applied towards the loan the one-third of these proceeds to which Turner was entitled. Accordingly, approximately $2,500 was paid on the loan in November 2017.

¶9    On February 9, 2018, Turner received a letter from a law firm "retained as counsel for [the Company] to assist in the enforcement of [the] past due loan." In relevant part, the letter stated,

> As you know, on July 30, 2010, Dale K. Barker P.C. Profit Sharing Plan extended to you a loan in the [principal] amount of $25,000.00. . . . [Y]ou have failed in your obligations to repay the loan within the 60 day period.
>
> Pursuant to the Note, Dale K. Barker Co. P.C. (the "Note Holder") hereby gives you notice of your default. . . . If you do not pay the overdue balance . . . in full within the time period described above, the Note Holder may pursue legal action to enforce the Note.

¶10    On April 3, 2018, having received no further payments on the loan, a lawsuit was filed to enforce the Note and recover the outstanding balance on the loan. But as originally filed, the complaint listed the Company as the plaintiff. Before Turner answered the complaint, it was amended so that the Plan instead appeared as the plaintiff.

¶11    Turner then filed a motion for summary judgment, in which he asserted that the lawsuit was untimely because it was filed after the applicable six-year statute of limitations. The district court denied Turner's motion, agreeing with the Plan that the partial payments made towards the debt in February 2015 and November 2017 tolled the statute of limitations, and thus the statute of limitations "r[a]n anew" with each of those

payments. And as a result, the lawsuit, brought within six years of the partial payments, was timely.

¶12    The district court later held a bench trial, found that Turner had defaulted on the Note, and concluded that "Plaintiff [was] entitled to judgment on the Note." It thus awarded the amount outstanding on the loan: $113,750. Of this total award, $2,500 consisted of two late fees that the district court assessed—pursuant to a "late charges for overdue payments" provision in the Note—for the two payments made toward the loan after it was due: a $1,250 late fee for the payment in February 2015 and another $1,250 late fee for the payment in November 2017. (Cleaned up.) Turner objected to $1,250 of this award, arguing that the terms of the Note contemplated only one payment and thus only one late fee, regardless of the number of late payments. The district court rejected this argument.

¶13    Subsequently, the Plan filed a motion to recover its attorney fees and costs. This request was based on a provision of the Note that allowed the Plan to be reimbursed for these expenses. Turner argued that no expenses were recoverable under the Note because the Plan had failed to satisfy a condition referenced therein. Turner also argued that certain fees the Plan requested were not compensable. The district court rejected both arguments and awarded $32,774 in attorney fees and $527.50 in costs.

¶14    Turner appeals.


ISSUES AND STANDARDS OF REVIEW

¶15    First, Turner challenges the district court's denial of his motion for summary judgment, asserting that it erroneously concluded that the statute of limitations had been tolled. This is a legal question that we review for correctness. *See Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 18, 108 P.3d 741 ("The applicability of a statute of limitations and the applicability of [a

tolling provision] are questions of law, which we review for correctness." (cleaned up)).

¶16 Second, Turner challenges $1,250 of the district court's damages award, asserting that this amount constitutes additional late fees not awardable under the terms of the Note. Because Turner is assailing the district court's interpretation of the Note, we review this issue for correctness. *See Brady v. Park*, 2019 UT 16, ¶ 29, 445 P.3d 395 ("We review a district court's interpretation of a contract for correctness.").

¶17 Third, Turner challenges the district court's award of attorney fees and costs pursuant to the Note's provision relating to the reimbursement of expenses. In doing so, Turner first argues that the district court erred in awarding any attorney fees or costs, asserting that the plain language of the Note precluded any such award. We review this issue for correctness. *See id.*; *see also Jensen v. Sawyers*, 2005 UT 81, ¶ 127, 130 P.3d 325 ("The award of attorney fees is a matter of law, which we review for correctness."). Turner also argues that the district court erred in calculating the amount of attorney fees, asserting that certain fees awarded were not compensable. We review the district court's calculation of reasonable attorney fees for abuse of discretion but review any conclusions of law for correctness. *See Gilbert Dev. Corp. v. Wardley Corp.*, 2010 UT App 361, ¶ 16, 246 P.3d 131 ("Calculation of reasonable attorney fees is in the sound discretion of the trial court . . . [but] we review a trial court's conclusions of law regarding attorney fees for correctness . . . ." (cleaned up)).

## ANALYSIS

### I. Statute of Limitations

¶18 Turner's first contention is that the district court should have dismissed the case because the six-year statute of limitations had run. The agreement is governed by the Uniform

Commercial Code (U.C.C.), and the applicable statute of limitations is codified in Utah Code section 70A-3-118. In relevant part, the statute reads:

> [A]n action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or . . . within six years after the accelerated due date.

Utah Code Ann. § 70A-3-118(1) (LexisNexis 2009).

¶19    Although the lawsuit was filed more than six years after the loan was due, the district court found that the lawsuit was timely because the partial payments toward the debt in 2015 and 2017 tolled the running of the statute of limitations, with each payment functionally restarting the six-year limitations period. In so ruling, the district court relied on one of Utah's general tolling statutes, which reads in relevant part:

> An action for recovery of a debt may be brought within the applicable statute of limitations from the date:
>
> > (a) the debt arose;
> > (b) a written acknowledgment of the debt or a promise to pay is made by the debtor; or
> > (c) a payment is made on the debt by the debtor.

*Id*. § 78B-2-113(1) (LexisNexis 2018).

¶20    Turner first argues that the district court erred by even applying this general tolling provision. Specifically, he asserts that "looking at the plain language of [section 70A-3-118(1)] there is no provision for restarting the statute of limitations in the event of a partial payment," and that this omission was

"deliberate." From this, he argues that the legislature intended to preclude the operation of the general tolling statute.

¶21 We disagree. The official comments to UCC section 3-118—the provision on which Utah Code section 70A-3-118 was modeled after and is identical to—belie Turner's argument about the purported significance of the fact that the statute does not specifically include its own tolling provision for partial payments. And while the official comments to the UCC are "not authoritative," *see J.R. Simplot Co. v. Sales King Int'l, Inc.*, 2000 UT 92, ¶ 40, 17 P.3d 1100, they "are by far the most useful aids to interpretation and construction, promoting reasonably uniform interpretation of the code by the courts," *see Power Sys. & Controls, Inc. v. Keith's Elec. Constr. Co.*, 765 P.2d 5, 10 n.3 (Utah Ct. App. 1988) (cleaned up); *see also Lewiston State Bank v. Greenline Equip., LLC*, 2006 UT App 446, ¶ 17 n.8, 147 P.3d 951. Specifically, the official comments state,

> The only purpose of Section 3-118 is to define the time within which an action to enforce an obligation, duty, or right arising under Article 3 must be commenced. Section 3-118 does not attempt to state all rules with respect to a statute of limitations. For example, *the circumstances under which the running of a limitations period may be tolled is left to other law* pursuant to Section 1-103.

U.C.C. § 3-118 cmt. 1 (Am. L. Inst. & Unif. L. Comm'n 2020) (emphasis added). And the provision of the UCC referenced therein, section 1-103, is codified at Utah Code section 70A-1a-103. It in turn provides that "[u]nless displaced by the particular provisions of this title, the principles of law and equity . . . supplement its provisions." Utah Code Ann. § 70A-1a-103(2) (LexisNexis 2009). Therefore, because "[g]eneral principles of law and equity are meant to supplement the provisions of the UCC unless displaced by its particular provisions," *J.R. Simplot*, 2000 UT 92, ¶ 29, the absence of an express exemption within

Utah Code section 70A-3-118 indicates that it is indeed subject to and supplemented by our tolling provision for partial payments, *see also* U.C.C. § 1-103 cmt. 3 ("State law . . . increasingly is statutory . . . [and] the mere fact that an equitable principle is stated in statutory form rather than in judicial decisions should not change the court's analysis of whether the principle can be used to supplement the Uniform Commercial Code . . . .").

¶22    Moreover, case law from other jurisdictions further supports our interpretation of the statute. *See Lewiston State Bank*, 2006 UT App 446, ¶ 15 n.7 ("Because the Uniform Commercial Code is national in character, case law interpreting it is also national. Consequently, . . . we rely on case law from other jurisdictions to interpret the Code." (quoting *Power Sys. & Controls*, 765 P.2d at 10 n.2)). Indeed, various other courts have interpreted their respective versions of Utah Code section 70A-3-118 and have reached the same conclusion. *See Zelby Holdings, Inc. v. Videogenix, Inc.*, 82 N.E.3d 1067, 1070–72 & 1072 n.5 (Mass. App. Ct. 2017) (collecting cases and noting that courts throughout the country have embraced the "applicability of the partial payment rule to § 3-118"); *Keota Mills & Elevator v. Gamble*, 2010 OK 12, ¶¶ 17–18, 243 P.3d 1156 (holding that Oklahoma's statutory tolling provision for partial payments operated to supplement Oklahoma's version of section 70A-3-118 because Oklahoma's version of Utah Code section 70A-1a-103 "provides for general statutes to supplement the UCC"). And interpreting Utah Code section 70A-3-118 consistently with these other courts serves a primary purpose of the UCC, that is, "to make uniform the law among the various jurisdictions." *See* Utah Code Ann. § 70A-1a-103(1)(c); *see also* UCC § 1-103 cmt. 3 (noting that other statutes supplement the UCC to the extent that "they are consistent with the purposes and policies of the Uniform Commercial Code"). So, for the foregoing reasons, we reject Turner's argument that the district court erred by concluding that the tolling provision for partial payment of a debt, as set forth in Utah Code section 78B-2-113(1), supplements the UCC provision at issue, Utah Code section 70A-3-118(1).

¶23 Turner nevertheless argues that the tolling provision does not apply under the facts of this case because he never made "direct payments on the Note." He points out that the statute allows for tolling when "a payment is made on the debt *by the debtor*," Utah Code Ann. § 78B-2-113(1)(c) (emphasis added), and thus argues that any payments toward the debt "had to be made by [him]" to trigger this tolling provision. He asserts that his argument is supported by *Holloway v. Wetzel*, 45 P.2d 565 (Utah 1935), which he cites for the proposition that "payments made by third parties [do] not restart the running of the statute of limitations against the original borrowers."

¶24 These arguments are also unconvincing, and a brief glance at *Holloway* illustrates why. In that case, our supreme court explained that the partial payment of a debt tolls the statute of limitations because the payment is "regarded as evidence of a willingness and obligation to pay the residue, as conclusive as would be a personal written promise to that effect." *See* 45 P.2d at 568 (quoting *Marienthal v. Mosler*, 16 Ohio St. 566, 570 (Ohio 1866)). From this, the court explained that a partial payment must either be made by the debtor himself, "or under his immediate direction," so as to "warrant the assumption of a willingness to pay equal to [the debtor's] written promise to that effect." *Id.* (quoting *Marienthal*, 16 Ohio St. at 570). Applying the law to the facts of that case, the *Holloway* court held that partial payments made by one obligor did not toll the statute of limitations as to a different obligor who had no knowledge of, did not consent to, and indeed did not have "anything to do with" those payments. *See id.*

¶25 *Holloway* thus acknowledges that the overriding inquiry is substantive and involves a determination of whether the payment at issue evidences the debtor's acknowledgment and willingness to pay the debt. *See Butcher v. Gilroy*, 744 P.2d 311, 314 (Utah Ct. App. 1987) (applying *Holloway* and framing the inquiry as a question as to whether a particular payment permitted an inference that the debtor "renewed [his] promise to pay the [creditor] or acknowledged any obligation on his part to

pay the [creditor]"). And directly contrary to Turner's formalistic argument, we have specifically explained that *Holloway* permits a payment "by a third party at [the debtor's] direction" to satisfy the tolling provision. *See id.*

¶26    With this in mind, we have no trouble concluding that the payments made in 2015 and 2017 were at Turner's direction and indeed evidenced the existence of the debt and his desire to repay it. One need only look to the February 2015 emails in which Turner stated that he "did not expect to receive anything" of the "upcoming [settlement] payment" and told Barker to take Turner's one-third share of the settlement proceeds and apply them to the debt he owed to the Plan. And as a matter of fact, Turner's principal defense at trial involved conceding that he *did* direct Barker to apply those fees toward the loan, rather than pay him his fees directly, and that the 2015 and 2017 payments were made pursuant to that directive.[1] Given these circumstances, the mere fact that the payments on the debt were not *directly* made by Turner is immaterial.

¶27    Based on the foregoing, the district court did not err in determining that the underlying lawsuit was timely because of the partial payments made toward the loan in 2015 and 2017.

---

1. Turner's defense at trial was that this subsequent agreement existed, but rather than the amounts owed to him merely being applied to and *reducing* the amounts owed on the loan, the agreement was that the loan would be extinguished regardless of the amounts actually recovered in his ongoing collection cases. Indeed, the district court made factual findings to this effect (but ultimately rejected Turner's argument that the agreement contemplated extinguishing the amount owed on the loan in its entirety), which Turner has not challenged.

## II. Damages

¶28   Turner next contends that the district court awarded excessive damages by adding, under a provision of the Note, $2,500 in late charges—comprised of two $1,250 charges. Turner argues that, under the terms of the Note, only a single late charge may be imposed.

¶29   The provision at issue is entitled "Late Charges for Overdue Payments," and is set forth in section 6 of the Note, which outlines various terms in the event that Turner failed to pay the loan in full by the due date. The provision is specifically denominated as section 6(A), and reads as follows:

> **6. BORROWER'S FAILURE TO PAY AS REQUIRED**
>
> **(A) Late Charges for Overdue Payments**
>
> If the Note Holder has not received the full amount of any *payment* by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0000% of my overdue payment of principal and interest. I will pay this late charge promptly but *only once on each late payment*.

(Emphasis added.) Interpreting this provision, the district court assessed a late charge for each "payment[] made after the Note was originally due"—a $1,250 charge for the payment made in 2015, and another for the payment made in 2017.

¶30   Turner argues the district court erred because, by its "plain language," the Note "does not permit for the awarding of an additional penalty each time a payment is made." As an initial matter, Turner argues that the term "payment" as used in section 6(A) is defined in a different section of the Note—

specifically section 3, which sets forth the date that the loan was due, and states in its entirety:

> **3. PAYMENTS**
>
> I will pay the full principal and interest within sixty days of delivery to me of the loan proceeds. I will make my payment as directed by the Note Holder.

Turner asserts that, under section 3, "[t]here was only one 'payment' due under the Note," which was to occur within sixty days of the loan proceeds being delivered. He then reasons that this "is the only payment on which there is a due date which is the triggering event set forth" in section 6(A), and he concludes that only a single late fee could be assessed for failing to pay the loan in full by the date it came due.

¶31     However, Turner has not carried his burden of persuasion on appeal because he has not engaged with the district court's reasoning. *See Bad Ass Coffee Co. of Hawaii Inc. v. Royal Aloha Int'l LLC*, 2020 UT App 122, ¶ 48, 473 P.3d 624 (explaining that an appellant "cannot persuade us that reversal is appropriate without acknowledging the district court's decision and dealing with its reasoning"); *Hansen v. Kurry Jensen Props. LLC*, 2021 UT App 54, ¶ 43 ("With some frequency we have affirmed the ruling of the court below when an appellant fails to address the basis of the lower court's ruling."). Specifically, the district court's interpretation attempted to reconcile the fact that the Note contemplated only one payment due with the language applying a late fee to "each late payment." But on appeal, Turner simply ignores the "each late payment" language—and instead merely reiterates his own interpretation of the Note without ever commenting on the import of the language that formed the basis of the district court's ruling. So, because Turner has not demonstrated why the district court's reasoning was erroneous, he is not entitled to reversal.

III. Attorney Fees and Costs

A.      Award of Any Fees or Costs

¶32     Turner next contends that the district court erred by awarding the Plan $32,774 in attorney fees and $527.50 in costs under a provision of the Note allowing for the reimbursement of expenses. Turner argues that neither expense should have been awarded because the Plan failed to satisfy an express condition to obtaining any such award.

¶33     As is relevant, section 6 of the Note states,

> **(C) Notice of Default**
>
> If I am in default, *the Note Holder may send me a written notice* telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.
>
> . . . .
>
> **(E) Payment of Note Holder's Costs and Expenses**
>
> *If the Note Holder has required me to pay immediately in full as described above*, the Note Holder will have the right to be paid back by me for all its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

(Emphasis added.)

¶34 As he did below, Turner asserts that compliance with section 6(C) is a "condition precedent" to any award of expenses under section 6(E).[2] The district court concluded that to the extent Turner's interpretation was correct, the written notice of default sent to him on February 9, 2018, satisfied the procedures set forth in section 6(C). *See supra* ¶ 9. Turner argues that the district court's ruling was erroneous because sections 6(C) and 6(E) both explicitly refer to the "Note Holder" sending the written notice of default, meaning that *the Plan* had to send the written notice of default, and he asserts that the February 9 letter was instead sent by *the Company*.

¶35 However, directly contrary to his argument, Turner previously admitted—in his answer to the amended complaint—that the Plan *did* send him the requisite notice under section 6(C).[3] This constitutes a judicial admission that fatally undercuts his argument that expenses should not have been awarded under section 6(E) of the Note.[4] *See Kranendonk v. Gregory*

---

2. Turner also argues that under the plain language of the Note, fees and costs are conditioned on the Note Holder sending "a notice threatening to accelerate the debt" and that the February 9, 2018 letter could not constitute a notice threatening acceleration, because the loan came due in 2010. *See Acceleration Clause*, Black's Law Dictionary (11th ed. 2019) (explaining that acceleration "requires the debtor to pay off the balance sooner than the due date"). We reject this argument. Acceleration is not mentioned anywhere in these provisions.

3. Specifically, Turner admitted without qualification: "On February 9, 2018, the Trustee [of the Plan] sent [me] a notice of default of the Note, pursuant to the terms of the Note, giving [me] 30 days to pay the overdue balance."

4. The impact of Turner's admission in his answer to the amended complaint was argued both below and again on appeal. It is unclear if the district court relied on the doctrine of

(continued…)

*& Swapp, PLLC*, 2014 UT App 36, ¶ 23, 320 P.3d 689 ("An admission in a pleading is . . . a judicial admission . . . ." (cleaned up)). And as our supreme court recently explained,

> A judicial admission is a formal waiver of proof that relieves an opposing party from having to prove the admitted fact. It also bars the party who made the admission from disputing it. The effect of a judicial admission is that once it has been made, the party cannot present any evidence that contradicts that statement.

(…continued)

judicial admissions in rejecting Turner's argument that the purported condition precedent was not satisfied: the district court's statement that "*Plaintiff* issued a 'Notice of Default of July 30, 2010 Note' to Defendant on February 9, 2018" could be read as implicitly accepting the Plan's argument that Turner had already admitted that the Plan (the plaintiff in the operative amended complaint) sent the written notice on the date referenced. (Emphasis added.) Regardless, whether the district court in fact relied on the doctrine of judicial admissions is immaterial to our resolution of Turner's appeal because we can "affirm a trial court's decision on any ground supported by the record." *See Lee v. Williams*, 2018 UT App 54, ¶ 50 n.5, 420 P.3d 88. And given that the Plan explicitly raised the same judicial admission argument to the district court that we now accept on appeal, our ground for affirmance is indeed supported by the record. *See Pentalon Constr., Inc. v. Rymark Props., LLC*, 2015 UT App 29, ¶ 25, 344 P.3d 180 ("An alternative ground is apparent on the record if the record contains sufficient and uncontroverted evidence supporting the ground or theory to place a person of ordinary intelligence on notice that the prevailing party may rely thereon on appeal." (cleaned up)).

*Luna v. Luna*, 2020 UT 63, ¶ 27, 474 P.3d 966 (cleaned up); *see also Roberts v. Roberts*, 2014 UT App 211, ¶ 41, 335 P.3d 378 ("Unless withdrawn or amended, admissions have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." (cleaned up)); *cf. Saghian v. Shemuelian*, 835 F. App'x 351, 353 (10th Cir. 2020) ("[E]ven if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding . . . ." (quoting *Missouri Housing Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990))).

¶36　Nevertheless, Turner asserts that he "should be relieved from his judicial admission." (Citing *Baldwin v. Vantage Corp.*, 676 P.2d 413 (Utah 1984).) In *Baldwin*, our supreme court acknowledged that the rule on binding judicial admissions is "not absolute" and that "[t]he trial court may relieve a party from the consequences of a judicial admission." *Id.* at 415. In that case, our supreme court held that the trial court did not abuse its discretion by relieving a party of an admission made in its pleadings where the pleading itself evidenced that the issue was mistakenly admitted and the parties thereafter treated the issue as though it was a material factual dispute to be resolved at trial. *See id.* at 415–16. Turner argues that his admission was similar to that in *Baldwin*, and thus he asserts that he should be relieved of his admission.

¶37　Turner's argument misses the mark. While it is true that the district court had discretion to relieve Turner of what is otherwise a binding admission, Turner never asked the district court to invoke its discretion to do so; he never requested the district court allow him to withdraw or modify his admission. On appeal, then, we are presented with a presumptively binding admission and no ruling by the district court to review. In other words, Turner's argument that he "should be relieved from his judicial admission" is unpreserved, and we decline to consider it any further. *See True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 24, 427 P.3d 338 ("It is incumbent on parties to preserve in the district court the issues they wish to assert on appeal or risk

losing the opportunity to have the appellate court address that issue." (cleaned up)).[5]

¶38    Based on the foregoing, we reject Turner's argument that the district court erred by awarding attorney fees and costs under the Note. As a result, we move to Turner's arguments about the amount of the attorney fees and costs awarded.

B.    Amount of Fees Awarded

¶39    Turner also contends that the district court nevertheless erred by awarding too much in attorney fees.[6] He raises two arguments in support of this contention: (1) the district court awarded fees "relating to issues on which [the Plan] did not prevail" and (2) the district court impermissibly awarded the Plan attorney fees "for services rendered to other parties." We address each argument in turn.

---

5. Turner does not argue that any preservation exceptions are applicable. *See True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 29, 427 P.3d 338 ("If a party has not preserved an issue asserted on appeal, the party asserting the issue on appeal must establish the applicability of one of the preservation exceptions to persuade an appellate court to reach that issue." (cleaned up)).

6. While Turner challenges the amount of *attorney fees* awarded under the Note, he has not ascertainably challenged the amount of *costs* awarded under the Note. Instead, Turner's argument about costs is premised on the notion that he was correct in arguing that no expenses should have been awarded under the Note, and that any award of costs "is therefore restricted to those costs otherwise awardable by statute or rule," and he then goes on to argue why certain costs are not recoverable under rule 54 of the Utah Rules of Civil Procedure. But we have rejected Turner's argument that the Plan cannot recover attorney fees and costs under the Note, and because Turner does not clearly challenge the amount of costs awarded under the Note, we need not address his arguments about rule 54.

¶40 Turner's first argument is that $2,496.50 in attorney fees awarded to the Plan should be eliminated from the overall award because these fees relate to an issue on which it "did not prevail"—specifically, a statement of discovery issues Turner filed that was granted in part and denied in part.[7] In support of his argument, he simply asserts that *Gilbert Development Corp. v. Wardley Corp.*, 2010 UT App 361, 246 P.3d 131, establishes a per se rule that "[w]here a prevailing party in litigation was unsuccessful on motions within the litigation, like summary judgment motions, the prevailing party is not entitled to fees relating to those motions."

¶41 We disagree. As explicitly stated in *Gilbert*, "[i]f attorney fees are recoverable by contract" a party may recover those fees "attributable to the successful vindication of contractual rights." *Id.* ¶ 52 (quoting *Cache County v. Beus*, 2005 UT App 503, ¶ 16, 128 P.3d 63). A natural consequence of this rule is that, as a general matter, a prevailing party will not be awarded attorney fees for fees related to an unsuccessful motion. *See Beus*, 2005 UT App 503, ¶ 16 (collecting cases). And while Turner's argument essentially restates this general principle, he fails to address the ramifications of, or even acknowledge, the fact that the Plan partially prevailed in opposing his statement of discovery issues—Turner's statement of discovery issues was explicitly denied in part, with a significant percentage of Turner's requests denied outright. In other words, Turner's conclusory argument fails to demonstrate that the fees awarded to the Plan were not "attributable to the successful vindication of [its] contractual rights," *Gilbert*, 2010 UT App 361, ¶ 52 (quoting *Beus*, 2005 UT App 503, ¶ 16), and accordingly, Turner fails to demonstrate that the district court erred by awarding these fees. We therefore

---

7. Turner also argues that, because the district court denied both parties' requests for costs when ruling on the motion initially, "[a]llowing fees already denied by the Court is an abuse of the system." But Turner offers no argument as to why that would be. Thus, we do not reach this argument's merits.

decline to disturb this aspect of the district court's award of attorney fees.

¶42 Turner's second argument is that the $2,242 of fees "incurred prior to April 5, 2018 should be disallowed" because these fees were apparently incurred by the Company and not the Plan. Basically, Turner's argument seems to be premised on the notion that, because the Company was listed as the plaintiff in the original complaint—prior to the complaint being amended on April 17, 2018, to list the Plan as the plaintiff instead—fees accruing from legal work early in the case were thus necessarily incurred by the Company.

¶43 However, we decline to address this argument because it is inadequately briefed. *See Broderick v. Apartment Mgmt. Consultants, LLC*, 2012 UT 17, ¶ 11, 279 P.3d 391 ("We have discretion to not address an inadequately briefed argument." (cleaned up)). Specifically, Turner fails to develop the facts necessary to understand and support his argument. For instance, it is unclear why all fees incurred "prior to April 5, 2018 should be disallowed"—Turner fails to explain the significance of this seemingly arbitrary date (fees were still incurred between this date and the date that the complaint was eventually amended to include the Plan as the plaintiff). Likewise, Turner's largely conclusory references to the accounting sheet,[8] which lists the attorney fees incurred, fails to demonstrate which entity incurred or actually paid individual fees, either initially or in the end. Essentially, Turner argues that various fees were inextricably incurred by the Company but leaves it to this court

---

8. In support of its motion for attorney fees, the Plan attached a verified Declaration for Attorney's Fees and Costs with an associated "Ledger Report" from the law firm that represented the Plan in the lawsuit, which itemized the "attorney and paralegal fees" the law firm had billed "[f]rom February 2018 through May 2019" for "representing the Plaintiff" in the lawsuit.

to parse the record and figure out how or why that might be. This we will not do. Accordingly, we decline to address Turner's argument, and therefore decline to disturb this aspect of the district court's award of attorney fees.

¶44    Based on the foregoing, Turner has failed to demonstrate that the district court erred in awarding any of the particular fees he challenges on appeal. As a result, we decline to reduce the amount of attorney fees awarded.

C.      Attorney Fees on Appeal

¶45    The district court awarded the Plan attorney fees and costs under the provisions of the Note, and we affirm this award. "It is well-settled that a provision for payment of attorney fees in a contract includes attorney fees incurred by the prevailing party on appeal as well as at trial, if the action is brought to enforce the contract." *Tronson v. Eagar*, 2019 UT App 212, ¶ 39, 457 P.3d 407 (cleaned up). "Having received attorney fees in the underlying action and under the conclusions reached in this opinion," the Plan is "entitled to recover reasonable attorney fees incurred on appeal." *See Phillips v. Skabelund*, 2021 UT App 2, ¶ 69, 482 P.3d 237. We therefore grant the Plan's "request for fees and costs on appeal and remand for the district court to calculate the award." *See Thomas v. Thomas*, 2021 UT App 8, ¶ 45, 481 P.3d 504.

CONCLUSION

¶46    The district court correctly determined that the underlying lawsuit was timely. And Turner has failed to establish that the district court erred in assessing two late fees in its overall calculation of damages or in awarding attorney fees and costs. Accordingly, we affirm the district court's ruling but remand for the court to calculate the Plan's attorney fees and costs reasonably incurred on appeal.

_____