2023 UT App 48

## THE UTAH COURT OF APPEALS

ELLIE ANDERSON,
Appellant,
*v.*
JACKSON DEEM,
Appellee.

Opinion
No. 20210558-CA
Filed May 11, 2023

Fourth District Court, Provo Department
The Honorable Robert A. Lund
No. 210400723

Jason B. Fida and Patricia Abbott Lammi,
Attorneys for Appellant

Emily Adams and Freyja Johnson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1 Jackson Deem used social media to send several messages to Ellie Anderson, his teenaged schoolmate. Anderson requested a civil stalking injunction, and the district court issued a temporary order. Deem requested a hearing, at which the court revoked the injunction and dismissed the case. The court considered each incident separately as to its emotional or fear-inducing effect to reach a conclusion that Deem had not engaged in a course of conduct as required by the civil stalking statute. In addition, the court justified its decision by referring to Deem's autism and to the potential availability of a no-contact order in an unadjudicated criminal case. Anderson appeals, claiming that the district court applied the wrong standard in its evaluation of the

issues. We agree, reverse the revocation and dismissal of the petition (thereby reinstating the injunction), and remand this matter to the district court so that it may apply the correct standard.

BACKGROUND[1]

¶2 Deem and Anderson were schoolmates, having intermittently attended elementary through high school together. As it is material in this case, we note that Deem was diagnosed with autism when he was around nine or ten years old.

¶3 The troubles underlying the present case stem from an incident in August 2018 when Anderson and Deem were starting tenth grade. Deem posted a message on Instagram stating that he was considering suicide. Seeing this message, Anderson called 911 to request a welfare check on Deem. Shortly after this, Deem posted that he was upset that someone had made the call. Notably, the record does not state that Deem ever said he knew who made the call, and Anderson testified that she was "not sure if he realized" that it was her.

¶4 After this incident, Anderson alleged that Deem sent her a series of unwelcome communications over a period of about three years.

*The Incidents of Alleged Stalking*

¶5 *First Incident*: Allegedly—there is no evidence of this event apart from Anderson's testimony—Deem posted a "hit list" on Instagram about a week after he posted the message alluding to suicide. According to Anderson, this message "stated that [Deem] wanted to shoot up the school and . . . listed people [he] was going

---

1. In the context of a "civil stalking injunction, we will recite the facts in a light most favorable to the trial court's findings." *Sheeran v. Thomas*, 2014 UT App 285, ¶ 2 n.1, 340 P.3d 797.

to be targeting," and she and her friend "were on there." Anderson asserted that she provided a screenshot of the message to her principal but did not otherwise save it or report it. Deem categorically denied posting such a list.

¶6     *Second Incident*: In July 2019, on the occasion of Anderson's sixteenth birthday, Deem posted a message to her Facebook page expressing the sentiment, "die, bitch." After this post, Anderson attempted to block Deem from contacting her on social media.

¶7     *Third Incident*: In May 2021, Deem, using a different account, sent Anderson a series of Instagram messages. Anderson testified that the first message was an apology stating that Deem "didn't think" Anderson was "going to take all of [his] threats seriously." This message was deleted and does not appear in the record; it was followed by four messages, which do appear in the record, from Deem over a period of about three hours.

¶8     In the first of these messages, Deem wrote,

> I don't know if you saw my apology from before, but I take it back. I wish nothing but the absolute worst for you in life. You being angry at what I said is one thing, but telling other people and blackballing me is another entirely. Why even care about what I said? No one values my opinion. I can scream at people how much I hate them all I want, but it doesn't erase the fundamental power imbalance. You and all the other people who've mistreated me over the years have destroyed my mental health irreparably. And the worst part is that no one cares or even acknowledges how they've hurt me. There's no reason why anyone should remember me because they have great lives today. But I don't have that luxury of not caring about the past because I have no future. Now there's not a

> single person from those schools who doesn't hate me, so those memories are tainted now.

In the next message, apparently sent immediately afterward, Deem stated,

> Unlike you, I acknowledge that I'm a terrible person. But you go about it in a different way. All those times you were nice to me were purely self-serving.

¶9 About two hours later, Anderson messaged Deem, "[P]lease stop harassing me or I will be going to the police." About an hour later, Deem expressed his discontent with her response by sending two messages of his own. The first read, "I'll be waiting for you in hell." And the second was the capitalized epithet "FUCK YOU"—followed by 529 exclamation points.

*The Injunction and Dismissal*

¶10 After receiving the May 2021 messages, Anderson requested a civil stalking injunction against Deem, citing the three incidents described above and one other incident.[2] *See* Utah Code

---

2. Anderson also asserted that "around [the] time or before [the] time" of the May 2021 messages, a hacked Instagram account sent a message to her friends' accounts stating, "I will murder your family." Anderson said the name on the sending account "was a bunch of scrambled letters" but that she had deciphered it to reveal Deem's name. Anderson speculated that Deem was surreptitiously sending the message to her through a third-party account, even though the message did not reference her in any way. Anderson attached a screenshot of this message to her request for the stalking injunction. At the hearing for the injunction, Deem objected to the admission of this evidence on the ground that there was not "any foundation" to show that it was

(continued…)

§ 78B-7-701(1)(a)(i) ("[A]n individual who believes that the individual is the victim of stalking may file a verified written petition for a civil stalking injunction against the alleged stalker with the district court in the district in which the individual or respondent resides, is temporarily domiciled, or in which any of the events occurred."). The district court granted that request and issued a temporary stalking injunction, ordering Deem to have no contact with Anderson and to stay away from Anderson's home, work, and school. *See id.* § 78B-7-701(3)(a). Deem requested a hearing on the temporary stalking injunction. *See id.* § 78B-7-701(4)(a) ("[T]he respondent is entitled to request, in writing, an evidentiary hearing on the civil stalking injunction.").[3]

¶11   At the hearing, Anderson, Deem, and Deem's mother (Mother) testified. Anderson testified about the incidents described above, namely the suicide threat and the three incidents. Apart from the hit list, Anderson had screenshots of the communications that she referred to in her testimony. She also testified that she last saw Deem in person during their sophomore year of high school, sometime in 2018.

---

from Deem's account. The court agreed with Deem, noting that the connection with Deem was tenuous and that the message was directed to a third party without reference to Anderson. Anderson does not challenge the exclusion on appeal.

3. If a respondent requests a hearing within ten days "after the day on which the . . . civil stalking injunction is served," the "burden is on the petitioner to show by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." Utah Code § 78B-7-701(4)(a), (b)(ii). "If the respondent requests a hearing after the 10-day period after service, . . . the burden is on the respondent to show good cause why the civil stalking injunction should be dissolved or modified." *Id.* § 78B-7-701(7). Here, Deem filed the request within ten days. Accordingly, at the ensuing hearing, Anderson bore the burden of proof.

¶12 Deem testified that he had not posted a hit list. He also testified that he never intended to cause Anderson fear or emotional distress. Rather, he said he "lashed out" on social media and had no intent to follow up, noting that Anderson was "just . . . the first person who came to mind as someone [he would] like to say those things to." Deem also testified that he was homebound, did not drive or have a license, and never left his house without his parents. And he stated that he understood that he could not have any contact with Anderson and that he "did potentially cause [Anderson] emotional distress." Finally, he testified that he did not know where Anderson lived.

¶13 Mother testified that she did not recall being informed by the school that Deem sent a hit list or threatened to shoot up the school in 2018. She testified that apart from an incident in fourth grade, she did not know Deem to be physically violent. However, she testified that Deem does "lash out with his words" from "behind a computer screen." And concerning his mobility, she testified that Deem does not drive or leave the house without her or his father.

¶14 After hearing the evidence, the district court concluded that Anderson had "failed to meet the standard [of] by a preponderance of the evidence for a continuation of the injunction." *See id.* § 78B-7-701(5) ("At the hearing, the court may modify, revoke, or continue the injunction. . . . [T]he burden is on the petitioner to show by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred.").

¶15 In arriving at its decision, the court considered the three incidents to determine if there was a course of conduct under the stalking statute: "An actor commits stalking if the actor intentionally or knowingly . . . engages in a course of conduct directed at a specific individual and knows or should know that the course of conduct would cause a reasonable person: (i) to fear for the individual's own safety or the safety of a third individual; or (ii) to suffer other emotional distress . . . ." *Id.* § 76-5-106.5(2)(a).

¶16    Regarding the first incident, the court determined that it was "disputed and there was no independent evidence provided that the list was created or that . . . Anderson's name was on it." Concerning the second incident, the court stated that it "certainly" consisted of "conduct that could qualify under the statute as something that would create emotional distress." And about the third incident, the court noted that it "contain[ed] two potentially concerning language references." The first was the profane expression of "FUCK YOU," but the court observed that this phrase is "so ubiquitous in our culture" as to have "no significance at all" or to be in "any way threatening." The court stated, "[I]t's not a term that causes emotional distress. It's replete in our culture, in our language, in our entertainment." Accordingly, the court found "that saying that to someone alone is not a basis to support the petition" for a stalking injunction. The court reasoned that the other phrase—"I'll be waiting for you in hell"—"conveys that both parties have engaged in a pattern that makes them worthy of being relegated to hell" and that it was "not threatening on its face."

¶17    The court reasoned that because "two of those events [did not] meet the standard for potentially satisfying the requirements of the statute," it was left "with one [incident] that occur[red] over the period of three years," which failed "to meet the course of conduct requirement of the statute." *See id.* § 76-5-106.5(1)(a)(i) (defining course of conduct as "two or more acts directed at or toward a specific individual, including . . . acts in which the actor . . . communicates to or about an individual").

¶18    The court acknowledged that Deem's communications had a "significant impact" on Anderson. But when viewing the communications "independently" and "objectively," and "weighing [the evidence] against the statutory requirement," the court concluded "that there [was not] a further basis to enjoin . . . Deem's behavior." The court clarified that while Deem "communicated to or about" Anderson, he did not do so "in a way that invokes the necessity to enjoin him in the future," noting that

there was not "a course of conduct at issue here given the time frame [and] given the specific language that was used."

¶19 The court then made two additional observations to justify not extending the injunction. First, it delved into the impact of Deem's autism:

> And furthermore, I think that all this has to be taken in terms of whether or not he knowingly and intentionally[4] engaged in the course of conduct and whether or not he knew or should have known that a reasonable person would be in fear[.] [T]hat has to be viewed in light of . . . Deem's special circumstances. If he didn't have the diagnosis and the things that he does have, we might attribute more mens rea to him[,] and I think that somebody receiving communications from him in terms of how threatening they are or whether they would put someone in fear [or] apprehension, has to be viewed in the context of his condition, of the fact that he has no history of violence, that he's not mobile. All those things relate to the reasonableness with which somebody would view this language.

¶20 Second, the court considered the impact of a criminal case—presumably related to the third incident. The court noted that Deem indicated that he would be "stipulating" to "a criminal no contact order . . . in that case." The court observed that this potential no-contact order would provide Anderson "with the protection that she'll need, if that protection is needed, which is, you know, not certain in this [c]ourt's mind."

---

4. The statutory standard is "intentionally or knowingly," not "intentionally and knowingly." *See* Utah Code § 76-5-106.5(2).

¶21 With that, the district court ordered the stalking injunction dismissed. Anderson appeals.

ISSUE AND STANDARDS OF REVIEW

¶22 The issue on appeal is whether the district court "erred in its construction and application of the Utah stalking statutes" when it declined to continue the temporary stalking injunction. A court's "interpretation and application of the relevant statutory provisions" regarding continuing a stalking injunction "is a question of law which we review for correctness, affording no deference to the district court's legal conclusions." *Ellison v. Stam*, 2006 UT App 150, ¶ 16, 136 P.3d 1242 (cleaned up). Although the question of whether the course of conduct would "cause a reasonable person [in a petitioner's circumstances] to suffer fear or emotional distress" is "a question of fact that we review for clear error, we review the district court's interpretation of the underlying legal standard for correctness." *See Ragsdale v. Fishler*, 2021 UT 29, ¶ 16, 491 P.3d 835.[5]

ANALYSIS

¶23 Those who believe they are victims of stalking may file a petition for a civil stalking injunction against the alleged stalker with the district court. *See* Utah Code § 78B-7-701(1)(a)(i). If the

---

5. Anderson also argues on appeal that the district court erred in considering that a no-contact order was available to her from Deem's criminal matter—presumably arising from the third incident—in determining whether she was entitled to a stalking injunction. We agree. Consideration of whether other remedies (criminal or otherwise) exist is not contemplated in relevant caselaw or the stalking statute. *See infra* note 12. But we need not address this issue further given the manner in which we resolve this appeal.

court determines there is reason to believe that there has been an offense[6] of stalking, it may issue a civil stalking injunction restraining the alleged stalker from, among other actions, going near the other party or having contact with the other party. *Id.* § 78B-7-701(3)(a).

¶24 Our supreme court summarizes stalking as follows:

> The crime of stalking consists of two elements. First, a person must intentionally or knowingly engage in a course of conduct directed at a specific person. Second, that person must know or should know that the course of conduct would cause a reasonable person to fear for the person's own safety or suffer other emotional distress. A district court may enjoin an alleged stalker only if both elements are met.

*Ragsdale v. Fishler*, 2021 UT 29, ¶ 25, 491 P.3d 835 (cleaned up); *see also* Utah Code § 76-5-106.5(2)(a). Here, the district court's approach suffered from two primary infirmities that we will address in turn. First, the district court erroneously considered incidents to be potentially part of a course of conduct only if each discrete incident was capable of causing fear or emotional distress. Second, and relatedly, the district court considered each incident in isolation as to whether fear or emotional distress might be engendered. In both regards, this approach is at odds with the applicable statute and precedent.

---

6. While it may seem odd to discuss an "offense" in a civil context, the stalking injunction statute borrows its definition from the criminal stalking statute. In other words, to "obtain a civil stalking injunction, a petitioner must establish the elements necessary to meet the definition of stalking in the criminal code." *See Higley v. Buhler*, 2019 UT App 96, ¶ 11, 446 P.3d 92 (per curiam); *see also* Utah Code § 76-5-106.5(2).

## I. Course of Conduct Analysis

¶25 Here, there is no dispute as to the first element. Deem intentionally or knowingly communicated with Anderson in the second and third incidents.[7] Indeed, Deem "concedes that there was a course of conduct here, as defined by the statute." But for the sake of clarity and as this matter is being remanded for further consideration, we note that a course of conduct does not necessarily involve threatening behavior—as it appears the district court seemed to require in its approach to this case. Rather, a course of conduct merely requires "two or more acts directed at or toward a specific individual." *See* Utah Code § 76-5-106.5(1)(a)(i). These acts might well be threatening, but they don't have to be. Instead, they can include "acts in which the actor . . . communicates to or about an individual," directly or indirectly and by any means. *See id.* § 76-5-106.5(1)(a)(i)(A).

¶26 As our supreme court has made clear, establishing a course of conduct is the first step in the stalking analysis. *See Ragsdale v. Fishler*, 2021 UT 29, ¶ 25, 491 P.3d 835. This step should not be conflated or combined with the second part of the analysis, which involves a determination as to whether the course of conduct would cause a reasonable person fear or emotional distress. *See id.* Here, the district court's analysis on this point lagged a bit in clarity. The court said that because two of the three alleged incidents were not capable of inducing fear or emotional distress in the court's view, they did not "meet the standard for potentially satisfying the requirements of the statute, . . . leav[ing] us with one [incident] that occur[ed] over the period of three years[,] which also fails to meet the course of conduct requirement of the statute." Insofar as the district court was saying that while Deem committed two more acts that would have satisfied the course of conduct requirement had those acts been threatening in nature, the district court erred in its interpretation of the statute. For the

---

7. Deem stated that Anderson was "the first person who came to mind" when he wanted to lash out.

purpose of showing a course of conduct, the *Ragsdale* court clearly explained, "[I]f a respondent follows, threatens, or communicates to a petitioner only once, he or she has not engaged in a course of conduct. But *if a respondent* follows, threatens, or *communicates* to the petitioner *on two or more occasions*, he or she engages in a course of conduct directed at the petitioner." *Id.* ¶ 31 (emphasis added).[8] Deem's communications in the second and third incidents easily fit the bill required by the first element of the statute. Deem acknowledged that he intentionally or knowingly communicated on multiple occasions with Anderson. That's likely why Deem concedes that the course of conduct occurred.

---

8. The third incident likely established a course of conduct by itself. In *Hardy v. Hardy*, 2020 UT App 88, 467 P.3d 931, *cert. denied*, 474 P.3d 948 (Utah 2020), our court said, "We could conceive of a circumstance in which a single event with multiple distinct acts undertaken for different purposes or separated by some amount of time might constitute a course of conduct." *Id.* ¶ 7 n.4; *see also State v. Miller*, 2023 UT 3, ¶ 126 (explaining that repeatedly replying to emails in the same thread "does not convert each of [the] separate emails into a single act" when the emails in the chain were sent over a period time). This is what we have in the third incident. *See supra* ¶¶ 7–9. First, there was an apology. Second, there were two consecutive messages in which Deem rescinded the apology and complained about the way he had been treated. Then—about three hours later and after Anderson had replied with a message telling Deem to "please stop harassing her or [she would] be going to the police"—Deem sent a third set of messages with the profanity and the reference to hell. These three communications likely constituted a course of conduct because each had "different purposes" and because they (or at least the second and third communications) were "separated by some amount of time." *See Hardy*, 2020 UT App 88, ¶ 7 n.4. Thus, it seems likely that there were four communications—or "acts" in the parlance of the statute (namely, the second incident, the apology, the rescindment, and the profanity and hell comment)— to satisfy the course of conduct requirement.

But the district court's consideration of whether fear or emotional distress was associated with each communication was an erroneous distraction in this part of the statutory analysis.

## II. Emotional Distress and Fear for Safety Analysis

¶27 Regarding the second element, the district court determined that only one communication—the second incident—would cause "a reasonable person to fear for the person's own safety or suffer other emotional distress." *See Ragsdale v. Fishler*, 2021 UT 29, ¶ 25, 491 P.3d 835 (cleaned up). In so concluding, the district court considered each communication in isolation. This was error.

¶28 The court declined to consider the alleged communication associated with the first incident because (1) the incident was disputed and (2) Anderson did not provide evidence, apart from her sworn testimony, to corroborate the claim that the hit list was created or that her name was on it. And the court concluded that the third incident was not threatening or emotionally distressful. Given that this effectively left only one incident to constitute the course of conduct in the court's view, the district court concluded that Anderson had not shown by a preponderance of the evidence that Deem had stalked her so as to satisfy the conditions for continuing the injunction. *See* Utah Code § 78B-7-701(5). However, precedent holds that a district court should consider the course of conduct cumulatively. This the district court failed to do. While the district court was free to ignore the first incident because the court ruled it had not been proved to have occurred, the court erroneously failed to consider the remaining acts in the course of conduct collectively.

¶29 To qualify for a stalking injunction, "a petitioner must meet an objective—not subjective—standard." *Baird v. Baird*, 2014 UT 8, ¶ 24, 322 P.3d 728. Under this "solely objective standard, the subjective effect of the respondent's conduct on the petitioner is irrelevant. Rather, the petitioner must establish only that the

respondent's conduct would cause emotional distress to a reasonable person in the petitioner's circumstances." *Id.* ¶ 25. But by "including 'in the victim's circumstances' as part of the 'reasonable person' definition," the statute "provides for an individualized objective standard," meaning that "a court must consider the entire context surrounding [the] defendant's conduct." *Id.* ¶ 26; *see also State v. Miller*, 2023 UT 3, ¶¶ 82, 91 (reciting the same standard); Utah Code § 76-5-106.5(1)(a)(v) (defining a reasonable person as "a reasonable person in the victim's circumstances").[9] Thus, "acts that seem perfectly innocent or even well intentioned may constitute stalking. For example, conduct such as sending the victim a dozen roses may seem benign and loving to the casual observer, but could mean a very different thing when understood in the context of the victim's experience." *Baird*, 2014 UT 8, ¶ 26 (cleaned up). "Courts applying this individualized objective standard have considered such factors as the victim's background, the victim's knowledge of and relationship with the defendant, any history of abuse between the parties, . . . and the *cumulative effect* of defendant's repetitive conduct." *Id.* ¶ 27 (cleaned up) (emphasis added); *see also Miller*, 2023 UT 3, ¶¶ 83–86 (noting that the factors listed in *Baird* are not exhaustive of the behaviors "that could, in certain circumstances, cause a victim emotional distress").[10]

---

9. In this regard, the district court's approach was arguably backward. The district court considered the individual circumstances of the respondent—a consideration absent in the statute—and failed to properly consider the individual circumstances of the petitioner. *See supra* ¶ 19.

10. Still, our supreme court has cautioned that "when assessing these and other relevant factors, . . . courts must avoid succumbing to a purely subjective analysis, which is inconsistent with the objective standard's intent to protect against criminalizing conduct that only an unreasonably sensitive or

(continued…)

¶30 Here, the district court's analysis was legally flawed because it approached the matter using an insular rather than a holistic framework to arrive at its conclusion that Deem's course of conduct was not of such a type as to cause fear or emotional distress to a reasonable person. In other words, the court erred by looking at the individual acts that created the course of conduct rather than the course of conduct and other relevant incidents cumulatively.

¶31 The district court's focus on the individual acts in isolation from the overall course of conduct is especially problematic with regard to the third incident. First, the district court concluded that the term "'fuck you' . . . is so ubiquitous in our culture" that it was of "no significance at all" or in "any way threatening." The court stated that this profane statement is "not a term that causes emotional distress" given that its use is "replete in our culture, in our language, in our entertainment." From its common use, the court found "that saying that to someone alone is not a basis to support the petition" for a stalking injunction. The court might be right that, *standing alone*, this term would not cause fear or emotional distress.[11] But analyzing the profanity in isolation from

___

paranoid victim would find harassing so as to reduce the risk of a truly innocent defendant falling within the ambit of a stalking statute." *Baird v. Baird*, 2014 UT 8, ¶ 27, 322 P.3d 728 (cleaned up).

11. Although even this conclusion seems to rest on shaky ground. Our supreme court in *Ragsdale v. Fishler*, 2021 UT 29, 491 P.3d 835, noted, "[T]he fact that [the respondent] flipped off and communicated obscenities" to the petitioner "on two or more occasions" meant that the petitioner "could potentially obtain an injunction against" the respondent. *Id.* ¶ 39. Granted, the supreme court added, "But this does not mean that every person flipped off and sworn at two or more times by the same individual is entitled to a stalking injunction." *Id.* ¶ 39 n.29. Yet, this is the point. In context, considering the particular circumstances of a

(continued…)

the other acts establishing a course of conduct is not what the stalking statute asks us to do. As our supreme court has clarified, courts "must consider the conduct cumulatively, accounting for the facts and circumstances of the individual case," rather than considering the individual acts making up the course of conduct in isolation from each other. *See Ragsdale*, 2021 UT 29, ¶ 45 (cleaned up); *see also Baird*, 2014 UT 8, ¶ 27. Thus, while the profanity alone might not be enough to cause fear or emotional distress, when considered in conjunction with Deem's wish to see Anderson in hell and his earlier communication that she was a "bitch" that he would like to see "die," a different picture emerges. Moreover, Deem's use of capital letters and hundreds (529, to be precise) of exclamation points in his final communication could be seen as expressing a certain amount of rage that goes well beyond the casual use of profanity. Thus, Deem's overall course of conduct could very well be enough to cause fear or emotional distress.

¶32 Second, concerning Deem's statement, "I'll be waiting for you in hell," the district court made a similar error in concluding that it conveyed nothing more than "that both parties [had] engaged in a pattern that [made] them worthy of being relegated to hell" and that it was "not threatening on its face." Saying "I'll see you in hell" might carry a benign meaning when said jokingly between friends, but when coupled with the profanity and Deem's birthday greeting of "die, bitch," it takes on an altogether different connotation. In other words, evaluating the hell statement in isolation makes it seem benign, but when viewed as part of Deem's overall course of conduct, it could very well contribute to instilling fear or causing emotional distress.

¶33 On remand, we direct the district court to assess "the entire context surrounding" Deem's conduct—rather than relying on a "blanket conclusion" that the ubiquity of profanity precludes it

petitioner, even profanity ubiquitous in society might very well form the basis for an injunction.

from instilling fear or causing emotional distress—so as to "account for the cumulative impact of his behavior" over the entire period of the course of conduct. *See Ragsdale*, 2021 UT 29, ¶ 47; *see also Miller*, 2023 UT 3, ¶ 116 ("Although the jury found that [certain] prior conduct did not constitute stalking, [that prior conduct] remained relevant to understand [the respondent and petitioner's] relationship, the history they shared, and, therefore, whether [the respondent] knew or should have known [later actions] would cause a reasonable person in [petitioner's] position emotional distress.").

¶34   The district court also should conduct this analysis in light of the standard of a reasonable person in Anderson's circumstances. *See Ragsdale*, 2021 UT 29, ¶ 48. This does not give license for the district court to conduct "a purely subjective analysis" that provides voice to unreasonable sensitivity or paranoia. *See Baird*, 2014 UT 8, ¶ 27. But it does mean that the court must consider factors such as Anderson's "knowledge of and relationship" with Deem and their shared history in reaching its conclusion on whether Deem's course of conduct would cause fear or emotional distress. *See id.*[12]

---

12. Anderson asserts that the district court erred in considering Deem's autism and other facts such as Deem's lack of a history of violence and immobility. The district court's consideration of these points strayed well into the realm of the irrelevant. There is nothing in the record to suggest that Anderson should have regarded Deem's course of conduct as more or less threatening than it would have been had he not been diagnosed with autism. On remand, given the dearth of evidence about Anderson's knowledge of (1) the impact autism had on Deem's behavior, (2) Deem's lack of past violent conduct, and (3) Deem's other personal circumstances, we caution the district court to avoid the line of reasoning it previously embraced in this respect.

(continued…)

¶35 In sum, we remand this matter to the district court so that it may apply the appropriate objective standard as outlined above to its emotional distress and fear determination regarding the cumulative effect of Deem's multiple communications directed at Anderson. This standard requires that the court look at the context surrounding Deem's course of conduct. Specifically, we direct the district court to avoid looking at whether each of Deem's individual acts induced fear or caused emotional distress, instead focusing on the impact of the overall course of his conduct on a reasonable person in Anderson's circumstances.

CONCLUSION

¶36 The district court misapplied the standard in determining whether a course of conduct existed that would cause a reasonable person in Anderson's circumstances to suffer fear or emotional distress. We reverse the revocation and dismissal of Anderson's request for a civil stalking injunction (thereby reinstating the injunction) and remand this matter so that the court may apply the correct standard.

—————

The district court should also avoid speculation regarding the availability of a no-contact order because consideration of other remedies is nowhere contemplated in the stalking statutes. The consolation of the merely potential no-contact order is nebulous at best, especially considering that the criminal case was unadjudicated at the time of the hearing. *Cf. Miller*, 2023 UT 3, ¶ 119 (noting that the availability of an existing stalking injunction does not necessarily "mitigate" or "eliminate the emotional distress [a respondent's] behavior caused" when the course of conduct is ongoing).