**2025 UT App 105**

## THE UTAH COURT OF APPEALS

DEBRA JEAN REAM,
Appellant,
*v.*
JACOB M. REAM,
Appellee.

Opinion
No. 20230799-CA
Filed July 10, 2025

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 230400484

Ryan J. Schriever and Daniel G. Shumway,
Attorneys for Appellant

Asa E. Kelley and Vanessa A. Vietz,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1 Debra Jean Ream was granted a temporary civil stalking injunction (the Temporary Injunction) against her ex-husband, Jacob Ream.[1] Several hours after being served, Jacob emailed Debra a question related to their child's health insurance. He was arrested a few days later for violating the Temporary Injunction. An evidentiary hearing was held to determine if the Temporary Injunction should be made permanent. Debra argued it should be made permanent because Jacob engaged in a course of conduct that caused her emotional distress and because he violated the

_____

1. Because the parties share a surname, we refer to them by their first names, with no disrespect intended.

Temporary Injunction. After hearing the evidence, the district court dissolved the Temporary Injunction and declined to impose a permanent injunction. Debra filed a motion to alter or amend the findings or for a new trial under rules 52 and 59 of the Utah Rules of Civil Procedure (the Rule 59 Motion). The district court granted the motion in part—correcting two factual findings and clarifying its ruling on the course of conduct—and otherwise denied Debra's motion. Debra appeals both orders. We affirm.

## BACKGROUND[2]

### *Debra and Jacob's Relationship*

¶2      Debra and Jacob divorced in early 2020. They have two adult children, Ryan and Jessica, and a minor child, Will.[3] After getting back together and "act[ing] as if they . . . remained married," the relationship eventually soured again, and Debra began exclusively dating her boyfriend (Boyfriend) in 2022. The relationship between Boyfriend and Jacob became strained as well, and in February 2023 Jacob sued Boyfriend for defamation, slander, and electronic communications harassment and Boyfriend counterclaimed for electronic communications harassment. Debra and Jacob also remained involved in contentious custody proceedings.

### *Stalking Injunction*

¶3      In March 2023, Debra filed an ex parte petition for a civil stalking injunction (the Petition), which alleged that Jacob had engaged in a course of conduct that amounted to stalking. Debra

---

2. "In the context of a civil stalking injunction, we will recite the facts in a light most favorable to the [district] court's findings." *Anderson v. Deem*, 2023 UT App 48, n.1, 530 P.3d 945 (cleaned up).

3. We employ pseudonyms for all three children.

included a declaration from Boyfriend; it was signed on the same day he was served with Jacob's defamation lawsuit. Debra filed the Petition the day after she emailed Jacob to ask if he remembered who did Jessica's Halloween makeup the year before. Debra signed the Petition immediately below the statement, "I declare under criminal penalty under the law of Utah that everything stated in this document is true."

¶4 The court granted the Temporary Injunction, which ordered Jacob not to "contact, phone, text, mail, e-mail, or communicate in any way with" Debra, and to stay away from Debra's vehicle and home. The Temporary Injunction also ordered the parties to communicate about Will "only through the co-parenting app, 'Our Family Wizard' with the tone meter setting enabled and in use."

¶5 Jacob was served with a copy of the Temporary Injunction a few days after the court granted it. Several hours after he was served, Jacob emailed Debra in the same email thread as Debra's makeup question and asked, "Could you please take a picture of the front and the back of . . . my healthcare card and send to me thank you." Jacob was later arrested for violating the Temporary Injunction by sending this email.

*Evidentiary Hearing*

¶6 The district court held an evidentiary hearing to determine whether Jacob had stalked Debra and whether the Temporary Injunction should be made permanent. At the hearing, Debra, Jacob, and Boyfriend testified, and the parties presented evidence regarding the eight incidents alleged in the Petition.

¶7 **Wyoming Incident.** In the Petition, Debra described this event as follows:

> [Debra] and [Boyfriend] had traveled in his truck to
> stay at a hotel so they could watch [Jessica] compete

in the national high school rodeo finals. The room was booked in [Debra's] name with a credit card on file to pay for the room. . . . On the day they checked out, the front desk had informed them that the room had been paid by . . . [Jacob].

Debra did not testify about this incident at the hearing, but Jacob did. Jacob testified that Debra contacted him about flying her to Wyoming to watch Jessica compete at the national high school rodeo finals. Jacob agreed and paid for the flight. Debra and Jacob had a discussion over text about whether Debra could stay in Jacob's trailer or if she should get her own room. Then, rather than flying, Debra drove to Wyoming with Boyfriend and stayed in a motel. Debra and Jacob got along well, which prompted Jacob to pay for Debra's motel room. However, he testified that he did not end up doing so because someone else had already paid for it.

¶8     **Moving Vehicle Incident.** Jessica was driving Debra, Jacob, and Will in Jessica's vehicle that was pulling a horse trailer. During the drive, Debra "ma[de] some derogatory statements about [Jacob's] sister or niece." Jessica pushed back on Debra's comments and an argument ensued, with both Debra and Jessica yelling and screaming. Jacob began to record the argument for around thirty seconds but stopped after Will told Debra that Jacob was filming her. As the argument escalated, Debra demanded Jessica pull over and let her out. Jessica pulled over but there was not enough room to pull off the road all the way, so the trailer was in the road to some degree. Jacob told Jessica to continue driving, and Debra did not get out. A dispute occurred about whether Debra would take Will with her and ultimately, Jessica drove to Debra's house where Debra got out of the vehicle.

¶9     **Home Incident.** Jacob returned Will to Debra's house after his parent-time, but she was not home. Ryan was inside with some friends, and Jacob asked everyone if they had anything to eat and offered to buy them something from a fast food

restaurant. Jacob bought food and brought it back to the house. Debra and Jacob disagreed about whether Jacob "entered the house and sat on the couch or not."

¶10 **School Christmas Party Incident.** Boyfriend saw two cars that he thought belonged to Jacob drive by the elementary school, but he was unable to identify who was driving the cars.

¶11 **First Police Station Incident.** Words were exchanged between Jacob and Debra at one of their parent-time exchanges at the police station. Jacob accused Debra and Boyfriend of being intoxicated, and as he got back into his car, he angrily directed a police officer to search Debra's car. The officer spoke with Debra and Boyfriend and ultimately did not find them to be intoxicated.

¶12 **Second Police Station Incident.** Debra and Boyfriend picked Will up from Jacob at the police station. While Debra was buckling Will into his seat in Boyfriend's truck, Jacob "got into his vehicle, did a U-turn and pulled up alongside the truck, then rolled down his window" and took out his phone. Debra and Jacob disagreed about whether Jacob took pictures and videos of Boyfriend at this point or if Jacob only mimicked doing so.

¶13 **Horse Show Incident.** Debra and Boyfriend went to watch Jessica and Ryan in a two-day horse show. Jacob was in the arena helping Jessica, while Debra and Boyfriend watched from the stands. Debra and Jacob disagreed as to whether Jacob mouthed words and pointed his fingers at Debra and Boyfriend from his location in the arena. After the event had concluded for the night, Jacob emailed Debra at 1:11 a.m., asking—in reference to Will— "Where was my boy at who is watching him?" The next day, after watching the show, Debra and Boyfriend got in Boyfriend's truck. Jacob, who was riding his horse while leading another horse, stopped his horse "immediately behind the truck," where he stayed for around thirty seconds. Debra and Jacob disagreed as to whether Jacob then followed the truck as it was leaving or whether he went to "do things outside of the arena" and

happened to go the same direction as the truck. Jacob then sent another email later that day, saying, "Where was my boy at? [You] didn't respond yesterday."

¶14    **Email Incident.** Debra and Jacob were in their respective cars at the same location—either a school parking lot or a grocery store parking lot—when Debra received an email from Jacob that said, "Pretty cute little boy."

¶15    In addition to these eight incidents, Jacob also testified as to Debra's assertion that he had violated the Temporary Injunction. He testified that, after being served, he "looked at the top of [the Temporary Injunction] and flipped through two pages and thought, well, I don't know what it is." Jacob called his attorney for guidance regarding the papers, who told Jacob that he would "look at them, [and] visit with [Jacob]" that night. Jacob testified that he "absolutely [did] not" understand the requirements of the Temporary Injunction when he received it. And when asked, "Did you intend for that e-mail [about health insurance] to violate the [Temporary Injunction]?" he responded, "Absolutely not."

*Court's Ruling*

¶16    Following the hearing, the district court issued written findings of fact and conclusions of law (Order) that vacated the Temporary Injunction. With respect to whether Jacob intentionally violated the Temporary Injunction, the court found that while Jacob acknowledged being served with a copy of the injunction, the injunction "came at a time of litigation pending in [Jacob's] civil defamation case with [Boyfriend] as well as litigation pending in an ongoing modification of the [p]arties' divorce." Thus, Jacob was frequently receiving legal papers. Jacob "examined the first couple of pages, did not fully understand what was required of him, contacted his legal counsel who said he would get back to him, and in that interim before [he] had consulted with legal counsel or fully underst[ood] his

obligations," he sent an email, not through Our Family Wizard, to Debra about the health insurance card. The court concluded that Jacob had not intentionally violated the Temporary Injunction.

¶17    The court also found that Jacob did not knowingly violate the Temporary Injunction. Debra and Jacob had "been involved in a lengthy high-conflict divorce" with "significant periods of reconciliation post-divorce where they acted as if they remained married to each other." The day before filing the Petition, Debra emailed Jacob about Halloween makeup. According to the court, "Things appeared to be business as usual." The court found that, "[a]t best, the evidence [w]as evenly balanced as to whether [Jacob] knew or reasonably should have known what was required of him" by the Temporary Injunction. Accordingly, the court concluded that Debra "could not demonstrate that [Jacob] intentionally or knowingly violated" the Temporary Injunction.

¶18    The court found that Debra also failed to prove by a preponderance of the evidence that Jacob "intentionally or knowingly engaged in a course of conduct" that would cause a reasonable person in Debra's position to fear "for her own safety or the safety of a third party" or cause "other emotional stress." The court specifically found that Debra's "failure to disclose the totality of the circumstances" surrounding the Wyoming Incident "seriously undermine[d] her credibility in the eyes" of the court. The court also found that several of the incidents arose from custody exchanges and co-parenting, which the court found "should be expected in the context of the divorce." "Given the totality of the circumstances and how evenly the evidence [wa]s balance[d] on all of the events," the court was "not persuaded that a reasonable person under the circumstances presented in [Debra's] life would reasonably experience emotional distress." Thus, the court concluded that Debra failed "to demonstrate that there were two or more incidents of stalking" as required by statute, *see* Utah Code § 76-5-106.5(1)(a), (2)(a).

*Rule 59 Motion*

¶19   Debra filed the Rule 59 Motion. She argued that the evidence showed Jacob acted intentionally and knowingly in violating the Temporary Injunction. She also argued that the court did not conduct the proper analysis because it "looked at each event individually" rather than considering the cumulative effect of the course of conduct. Debra argued that the court's credibility determination of her was improper because the court "relied on statements outside of what was admitted at the evidentiary hearing," namely the Petition. Finally, Debra argued that two factual findings about the Wyoming Incident were incorrect.

¶20   The district court granted the Rule 59 Motion in part (the Rule 59 Order). The court clarified that it had not considered the "individual events in a vacuum" and had instead "considered those events in a totality of the circumstances as it [was] required to do," and was "not persuaded" that Jacob's course of conduct would cause a reasonable person in Debra's position emotional distress or to fear for her safety or the safety of others. The court amended two factual findings—the date of the "text messages regarding the . . . Wyoming [Incident]" and that Debra "travelled to Wyoming with [Boyfriend] by car" rather than by plane. Referencing Debra's argument that the court improperly relied on statements she made in the Petition, the court noted that those statements "constitute[d] a judicial admission" and the court "properly considered her statements in evaluating her credibility." The court otherwise denied the Rule 59 Motion.

ISSUES AND STANDARDS OF REVIEW

¶21   On appeal, Debra argues that the district court's decision to take judicial notice of the Wyoming Incident when she did not offer testimony about that incident at the hearing violated rule 201(e) of the Utah Rules of Evidence. "Two different standards of review apply to . . . claims regarding the admissibility of evidence.

The first standard of review, correctness, applies to the legal questions underlying the admissibility of evidence," while the "second standard of review, abuse of discretion, applies to the [district] court's decision to admit or exclude evidence." *Dierl v. Birkin*, 2023 UT App 6, ¶ 15, 525 P.3d 127 (cleaned up).

¶22 Debra also contends that the district court erred in dismissing the Temporary Injunction. "Whether the course of conduct would cause a reasonable person in a petitioner's circumstances to suffer fear or emotional distress is a question of fact that we review for clear error," and "we review the district court's interpretation of the underlying legal standard for correctness." *Anderson v. Deem*, 2023 UT App 48, ¶ 22, 530 P.3d 945 (cleaned up). And whether an actor violated a temporary civil stalking injunction depends upon the intent of the actor. "The determination of intent is a question of fact, which will only be reversed if the district court's finding is clearly erroneous." *Bonnie & Hyde, Inc. v. Lynch*, 2013 UT App 153, ¶ 13, 305 P.3d 196.

ANALYSIS

I. Wyoming Incident Evidence

¶23 The district court found that Debra's sworn statements in the Petition "constitute[d] a judicial admission." "A judicial admission is a formal waiver of proof that relieves an opposing party from having to prove the admitted fact." *Dale K. Barker Co. PC CPA Profit Sharing Plan v. Turner*, 2021 UT App 119, ¶ 35, 500 P.3d 940. As such, the "effect of a judicial admission is that once it has been made, the party cannot present any evidence that contradicts that statement." *Id.* And our supreme court has noted that under the judicial admission doctrine, "a party should not be able to plead or admit certain facts and then later present contradicting evidence." *Luna v. Luna*, 2020 UT 63, ¶ 28, 474 P.3d 966; *see also Rutherford ex rel. Rutherford v. Talisker Canyons Fin. Co., LLC*, 2014 UT App 190, ¶ 11 n.6, 333 P.3d 1266 (noting that a

factual allegation in a complaint "is a judicial admission and is normally conclusive on the party making it." (cleaned up)).

¶24　Utah's civil stalking statute allows "an individual who believes that the individual is the victim of stalking" to "bring a verified written petition for a civil stalking injunction against the alleged stalker." Utah Code § 78B-7-701(1)(a)(i). A petition is thus the operative pleading for initiating a civil stalking case. And here, Debra signed the Petition under the statement, "I declare under criminal penalty under the law of Utah that everything stated in this document is true." Accordingly, the district court properly considered Debra's sworn statements in the Petition regarding the Wyoming Incident as a judicial admission.

¶25　On appeal, however, Debra frames the issue as the district court improperly taking judicial notice of the Petition because she did not introduce it into evidence at the hearing. Specifically, she complains that neither "the district court nor either party asked for judicial notice of the" Petition and, thus, "it was never admitted and should not have been considered as evidence for impeachment or any other purpose." But even if we accept Debra's framing, we see no merit in her argument.

¶26　A district court may take judicial notice of "an adjudicative fact" on its own or when requested by a party and provided with the requisite information. Utah R. Evid. 201(a), (c). The "general rule is that courts may take judicial notice of the records and prior proceedings in the same case." *Iota LLC v. Davco Mgmt. Co.*, 2016 UT App 231, ¶ 40, 391 P.3d 239 (cleaned up); *see also State v. Shreve*, 514 P.2d 216, 217 (Utah 1973) ("A court will take judicial knowledge of its own records insofar as those records are a part of the matter before the court"); *In re F.M.*, 2002 UT App 340, ¶ 3 n.2, 57 P.3d 1130 (holding that the court did not err when it took judicial notice of records in the same case). The Petition was a record in the same case and was thus proper for judicial notice.

¶27   Debra also argues that taking judicial notice of the Petition was improper under rule 201 of the Utah Rules of Evidence because "impeachment evidence . . . does not contain the type of information capable of being judicially noticed." We disagree. Impeachment evidence is "evidence used to undermine a witness's credibility." *In re I.C.*, 2025 UT App 37, ¶ 11, 566 P.3d 1260 (cleaned up)), *cert. denied*, May 8, 2025 (No. 20240667). Here, Debra's "failure to disclose all of the circumstances surrounding" the Wyoming Incident in the Petition "significantly undermine[d] her credibility in these proceedings."

¶28   Thus, having properly accepted Debra's sworn statements in the Petition—whether as a judicial admission or through judicial notice—the district court did not abuse its discretion when it considered those statements in assessing her credibility.

## II. Dismissal of the Temporary Stalking Injunction

¶29   Utah Code section 76-5-106.5 provides two avenues for an actor to commit stalking.[4] As relevant to this appeal,

> an actor commits stalking if the actor intentionally or knowingly: (a) engages in a course of conduct directed at a specific individual and knows or should know that the course of conduct would cause a reasonable person (i) to fear for the individual's own safety or the safety of a third individual; or (ii) to suffer other emotional distress; or (b) violates . . . a [temporary] stalking injunction.

---

4. Utah Code section 76-5-106.5 has since been modified to change the wording in subsection 2(a). *See* Criminal Intent Amendments, ch. 179, § 2, 2024 Utah Laws 1490, 1492 (modifying "knows or should know that" to "knows or is reckless as to whether"). Accordingly, we cite the 2022 version of the statute.

Utah Code § 76-5-106.5(2) (2022). Debra asserts that the district court erred by (1) "conflating the first and second elements of the stalking injunction analysis," and (2) concluding that Jacob did not intentionally or knowingly violate the Temporary Injunction. We reject both arguments.

A.     Course of Conduct Causing Emotional Distress

¶30     Utah courts have "made clear" that "establishing a course of conduct is the first step in the stalking analysis." *Anderson v. Deem*, 2023 UT App 48, ¶ 26, 530 P.3d 945. A course of conduct is defined as "two or more acts directed at or toward a specific individual." Utah Code § 76-5-106.5(1)(a)(i) (2022). It "does not necessarily involve threatening behavior" and "merely requires two or more acts directed at or toward a specific individual." *Anderson*, 2023 UT App 48, ¶ 25 (cleaned up). Though these acts "might well be threatening," they are not required to be. *Id.* Indeed, a course of conduct may include routine acts, such as when "the actor communicates to or about an individual, directly or indirectly and by any means." *Id*. (cleaned up). Simply put, the statutory definition of acts that constitute a course of conduct is quite broad. This results in a relatively low bar for the petitioner to clear in the first step of the analysis. And the two steps of the stalking analysis are addressed serially, meaning that if there is no course of conduct, the court should end its analysis and deny the request for a civil stalking injunction.

¶31     If the court finds that an individual engaged in a course of conduct, the court then moves to the second step of the stalking analysis, where it considers "whether the conduct at issue would cause emotional distress or fear to a reasonable person in the petitioner's circumstances." *Staszkiewicz v. Thomas*, 2024 UT App 183, ¶ 17, 562 P.3d 723 (cleaned up), *cert. denied*, 583 P.3d 260 (Utah 2025); *see also Ragsdale v. Fishler*, 2021 UT 29, ¶ 45, 491 P.3d 835 ("This is an objective standard under which the subjective effect of the respondent's conduct on the petitioner is irrelevant."

(cleaned up)). Under the second step, "courts must consider the entire context surrounding a respondent's conduct," and "in this context, acts that seem perfectly innocent or even well intentioned may constitute stalking." *Ragsdale*, 2021 UT 29, ¶ 45 (cleaned up). Importantly, step one "should not be conflated or combined with" step two. *Anderson*, 2023 UT App 48, ¶ 26 (cleaned up).

¶32    Debra argues that the district court erred because it conflated the two steps and considered whether each incident caused emotional distress individually rather than collectively. We agree that the district court's analysis of the two steps was initially unclear. In the Order, the court found that Debra "failed to prove, by a preponderance of the evidence, that [Jacob] intentionally or knowingly engaged in a course of conduct that would cause" a reasonable person in her position to fear "for her own safety or the safety of a third party," or "to suffer other emotional stress." The court went on to explain that the Horse Show Incident was the "one event that has been proven that could constitute an event of stalking," but "that is only one and the statute requires two." The court then concluded that Debra "failed to demonstrate two or more incidents required by the statute." However, the Order detailed five incidents alleged by Debra that involved communications directly between Debra and Jacob, which would establish a course of conduct. Thus, it appears that the district court might have conflated the two steps of the stalking analysis.

¶33    But the Order was not the last thing the district court said about the matter. In the Rule 59 Motion, Debra raised before the district court the same argument she presents to us on appeal: the district court erred because it conflated the two steps and examined whether each incident could cause emotional distress individually.[5] The district court held a hearing on the Rule 59

---

5. Indeed, much of Debra's argument in the Rule 59 Motion was repeated verbatim in her brief before this court.

Motion and then issued the Rule 59 Order. The record presented to us on appeal lacks a transcript of the hearing on the Rule 59 Motion. "Appellants bear the burden of proof with respect to their appeals, including the burdens attending the preservation and presentation of the record." *State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92. In light of this burden, "if an appellant fails to provide an adequate record on appeal, this court must assume the regularity of the proceedings below." *Id.* ¶ 11 (cleaned up).

¶34 With only the Rule 59 Order available to us, we must assume it accurately reflects the proceedings at the hearing. And in the Rule 59 Order, the district court clarified that it had not considered the "individual events in a vacuum," but had, instead, "considered those events in a totality of the circumstances as it is required to do" and was "not persuaded" that a reasonable person in Debra's position would experience emotional distress. This is the proper two-step stalking analysis. *See Anderson*, 2023 UT App 48, ¶ 24. Thus, to the extent the district court's Order was unclear on its analysis of the course of conduct, the court made clear in the Rule 59 Order that it did perform the correct two-step analysis.

¶35 Insofar as Debra also challenges the district court's conclusion that Jacob's course of conduct would not cause a reasonable person in Debra's position to suffer emotional distress or fear for her safety or the safety of others, we find no merit in the argument. The court found Debra not credible in her testimony about several of the incidents, including, most significantly, the Wyoming Incident, which "seriously undermine[d] her credibility in the eyes of the Court." The court found that Jacob was not credible in his testimony regarding the Horse Show Incident. And the court found that Boyfriend's credibility was "color[ed]" by his motives, including that Jacob was suing him for defamation and that Boyfriend signed his declaration in support of the Petition on the same day he was served with the lawsuit. On matters of credibility, "we defer to the

district court." *In re Discipline of Steffensen*, 2018 UT 53, ¶ 32, 428 P.3d 1104.

¶36   The district court also found that a number of the incidents arose from tense interactions regarding custody exchanges and each party's presence at Will's school, which the court found "should be expected in the context of the divorce." And regarding several other incidents, the court viewed the evidence as "evenly balanced" as to what had actually occurred. The court thus concluded that a reasonable person in Debra's circumstances would not suffer emotional distress or fear for her safety or the safety of others. Debra has failed to demonstrate that any of these factual findings were clearly erroneous such that "no reasonable factfinder could review the evidence presented and arrive at the disputed finding." *Nelson v. Nelson*, 2023 UT App 38, ¶ 41, 529 P.3d 370 (cleaned up). Accordingly, we affirm the district court's determination that there was insufficient evidence that Jacob engaged in a course of conduct that would cause a reasonable person in Debra's position to suffer emotional distress or to fear for her own safety or for the safety of another person.

B.      Violation of the Temporary Injunction

¶37   An actor can also commit stalking if the actor "intentionally or knowingly" violates a temporary civil stalking injunction. Utah Code § 76-5-106.5(2) (2022). *See generally id.* § 78B-7-701. Our supreme court has "emphasize[d] that intent is a question of fact. And we will not set aside a [district] court's findings of fact unless they are clearly erroneous." *Pennington v. Allstate Ins. Co.*, 973 P.2d 932, 937 (Utah 1998) (cleaned up). A factual finding is "clearly erroneous only if it is against the clear weight of the evidence." *Id.* (cleaned up).

¶38   At the evidentiary hearing, the district court heard testimony from Debra, Jacob, and Boyfriend. The district court found that the evidence was "undisputed that it was not [Jacob's] conscious objective to violate the" Temporary Injunction and it

was "not persuaded that [Jacob] knew or reasonably should have known what was expected of him under the [Temporary Injunction]." The court further found that Debra and Jacob had been "involved in a lengthy high-conflict divorce" with "significant periods of reconciliation post-divorce where they acted as if they remained married to each other." The court found that the day before Debra filed the Petition, she emailed Jacob about Jessica's Halloween makeup and "[t]hings appeared to be business as usual." Based on these findings, the court was "not persuaded that [Debra] . . . met her statutory burden" of proving that Jacob intentionally or knowingly violated the Temporary Injunction.

¶39 Debra argues it was improper for the court to rely on these findings because "[f]or the most part, they have to do with conduct the district court attributed to Debra, but they do not address the issue of whether Jacob acted with knowledge or intent." And in that regard, Debra asserts that Jacob's testimony that he did not understand the Temporary Injunction "was not truthful." In support of her contention, Debra points to the following testimony by Jacob at the hearing:

> Q: Can you tell me a little bit about what happened when you were handed the stalking petition?
>
> A. Help me on the stalking position. The—
>
> Q. Petition. So when you were handed the document— when you were handed the document back in March—
>
> A: The no contact order? That one?

But this testimony does not prove that Jacob's testimony that he did not understand the Temporary Injunction on the day he received it was "not truthful" as alleged by Debra. Rather, the testimony shows only that at the time of the hearing, which occurred many months after he was served and after he had been

arrested for violating the Temporary Injunction, Jacob described the Temporary Injunction as a "no contact order."

¶40 The district court found credible Jacob's testimony that—on the day he was served and before speaking with his attorney—he "did not understand what was required of him" by the Temporary Injunction. District courts "have the benefit of viewing the witnesses firsthand, to assess their demeanor and to consider their testimonies in the context of the proceedings as a whole, making them much better equipped to make credibility determinations." *Staszkiewicz v. Thomas*, 2024 UT App 183, ¶ 19, 562 P.3d 723 (cleaned up), *cert. denied*, 583 P.3d 260 (Utah 2025). We therefore do not second-guess the credibility determination of the district court as long as "there is a reasonable basis in the record to support" it. *Koehler v. Allen*, 2020 UT App 73, ¶ 17, 466 P.3d 738 (cleaned up). Here, the record supports the district court's determination of Jacob's credibility. At the hearing, Jacob testified that he "looked at the top of the [Temporary Injunction] and flipped through two pages and thought, [w]ell, I don't know what it is." And when he was asked at the hearing, "Did you understand what it was saying when you got it?" he responded, "Absolutely not."

¶41 Because the district court's findings do not conflict with the clear weight of the evidence, we cannot conclude that the district court erred. We therefore affirm the court's conclusion that Jacob did not intentionally or knowingly violate the Temporary Injunction.[6]

---

6. We observe two potential issues that may arise under the current statutory scheme. First, because Utah's civil stalking statute incorporates the criminal definition of stalking, *see* Utah Code § 78B-7-102(26), in order to have committed "stalking" by violating a temporary civil stalking injunction, the respondent

(continued…)

CONCLUSION

¶42    The district court properly took judicial notice of Debra's statements in the Petition and was free to consider them in its credibility determination. The court performed the correct analysis of the stalking allegations and its conclusions that Jacob did not engage in a course of conduct that would cause a reasonable person in Debra's circumstances to experience emotional distress and its findings that Jacob did not intentionally or knowingly violate the Temporary Injunction were not clearly erroneous. Affirmed.

_____

must have done so "intentionally or knowingly," *id.* § 76-5-106.5(2). Thus, an individual can avoid both civil and criminal responsibility for violating a temporary injunction by simply not reading the injunction when it is served, and is therefore incentivized not to read it. Second, the current statutory scheme allows an individual to obtain a permanent stalking injunction— even if the allegations are ultimately determined to be without merit—if the respondent violates the temporary injunction before an evidentiary hearing is held. To be clear, we do not countenance violation of any court order. But this situation creates the possibility that an individual could obtain a permanent stalking injunction where the allegations were without merit. To the extent that these statutory provisions do not reflect legislative intent, we invite the legislature to consider amendments to the statutory scheme.