**2026 UT App 48**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
FEDERICO APARICIO VAZQUEZ,
Appellant.

Opinion
No. 20251586-CA
Filed April 2, 2026

Second District Court, Ogden Department
The Honorable Craig Hall
No. 251902470

Hakeem Ishola and Francisco Roman,
Attorneys for Appellant

Derek E. Brown and Michael Palumbo,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

OLIVER, Judge:

¶1 Federico Aparicio Vazquez was charged with four counts of aggravated sexual abuse of a child for alleged abuse of two of his grandchildren, Maria and Sophia.[1] At his initial bail hearing, the district court denied Vazquez bail, finding there was substantial evidence to support the charges and Vazquez would be a substantial danger to other individuals or the community if released. Vazquez argues on appeal that such findings were not supported by the evidence. We disagree and affirm.

---

1. Both children are referred to by pseudonyms.

BACKGROUND[2]

¶2    This case began when Maria gave her mother (Mother) and father (Father)[3] a note that read, verbatim,

> Hey mom and dad i wanted to tell you that when grandma is in her room or kitchen and granpa is in the Living room he sits next to me and [Sophia] and touches are private and and the upper part and me and [Sophia] are really uncomfortable and we are scared.

At the time of disclosure in 2024, Maria was nine and Sophia was eleven. The girls explained to their parents that Vazquez would begin "with back rubs, then progress[] to their chests and stomachs, and eventually down their pants and underwear." Father confronted Vazquez, his own father, and the police were eventually called. When interviewed by police, Vazquez denied touching his granddaughters inappropriately but admitted "that he would rub [their] stomachs [and] backs, and hug them." He

---

2. This case comes before us as a statutorily authorized interlocutory appeal of the district court's denial of bail. *See* Utah Code § 77-20-209. "On interlocutory review, we recount the facts as alleged and in a light most favorable to the ruling below." *State v. Taylor*, 2015 UT 42, ¶ 2 n.2, 349 P.3d 696. We rely on the information available to the district court at the time it issued its ruling. *See generally* Utah Code § 77-20-205(8)(a). Despite our recitation, we note Vazquez "retains the presumption of innocence that attaches prior to conviction." *State v. Cordova*, 2023 UT App 99, n.1, 536 P.3d 666.

3. While Mother is Sophia's stepmother and Father is Maria's stepfather, we refer to them by "Mother" and "Father" for simplicity.

claimed the girls "must have seen something on the internet or were seeking attention."

¶3 Both girls were interviewed at the Children's Justice Center (CJC) shortly after the disclosure. Maria explained the inappropriate touching would start with Vazquez touching her back and her stomach before he began touching her "under her underwear." She indicated he used his palm and would go "all the way around and back on her 'vajayjay.'" She specifically identified an instance "in the bathroom" where Vazquez "touched something inside her where she pees," which she said was "really sensitive." She said during the episodes of abuse, "her private [felt] tingly and uncomfortable" and she would sometimes apply Vaseline to help with the discomfort. Maria explained that Vazquez's wife (Grandma) did not witness the abuse. Maria said that when she told Sophia about the abuse, Sophia said "it was happening to her too."

¶4 In Sophia's CJC interview, she explained the abuse had been occurring for about two years and Vazquez had "touched her many times on the couch while [Grandma] was in the other room." She described two specific incidents in the interview. First, she disclosed an occasion when she was at Vazquez's house watching television with her brother (Brother) in a bedroom. She said Vazquez came into the room and began rubbing her back "and then put his hands in her pants and rubbed her private part" with "one hand on her back and one hand under her panties." She explained that after Vazquez left the room, she "locked the bedroom door." She did not believe Brother had seen what Vazquez was doing. Brother later told her that "he saw [Vazquez] rubbing her back and breathing heavily." The other occasion Sophia described took place in the living room while Grandma was in the kitchen. She said Vazquez "started to rub her private and chest, tried to kiss her with his tongue, put his mouth on her boob and rubbed her chest." She reported that Vazquez gave her gifts of shoes, jewelry, and money but told her "not to tell

[Grandma] about the money." She described "feeling uncomfortable and unsafe" because of the abuse.

¶5 Brother was also interviewed at the CJC and corroborated the incident in the bedroom as described by Sophia. He was thirteen years old at the time of the interview, and described watching television in a bedroom with Sophia when Vazquez came in and began "hugging [Sophia], kissing her forehead and breathing hard." Brother said he could see Vazquez "rubbing [Sophia's] back under her shirt" out of the corner of his eye while watching television. And he observed Sophia lock the bedroom door after Vazquez left. He also said Vazquez "does not rub his back." Texts between Brother and Sophia showed Sophia told Brother that Vazquez touched her "in [her] private and the upper part."

¶6 Multiple people in the girls' lives noted changes in their behavior. Maria's teacher (Teacher) had contacted Mother indicating troubling behavior from Maria, including hiding under her desk, being unwilling to communicate about sad moods, and generally shutting down. Teacher indicated Maria "has done this before during the year but it has been a lot lately." A subsequent interview of Teacher by police corroborated these concerns, with Teacher indicating Maria had gone from "being a 'happy and smiley' child that was spontaneous and full of life, to being subdued, participating less, and hiding in a hoodie." Mother indicated that Maria "developed an attitude" and "became depressed," and Father indicated that he noticed behavioral changes as well. Mother and Father had also noticed that Sophia had begun "wetting the bed and not wanting to sleep alone," whereas before she had a more "independent attitude."

¶7 Both girls received a medical examination as part of the investigation. Maria and Sophia recounted the alleged abuse in their medical examinations consistently with what was reported in their respective CJC interviews. Although neither girl showed

physical signs of abuse or injury, the reports noted "that a normal genital exam does not rule out the possibility of sexual abuse or discount [the] disclosure" and, further, that the exams had been conducted "outside the timeframe for evidence collection."

¶8 In 2023, one year prior to Maria and Sophia's disclosure, the Utah Division of Child and Family Services (DCFS) had opened an investigation concerning Vazquez's eleven-year-old daughter (Daughter), who is intellectually disabled and mostly non-verbal. Daughter had drawn a picture of herself in bed with a man "on top of her," and she had said "Papa" while pointing at her buttocks, belly button, and vagina and grabbing her breasts. Both Vazquez and Grandma denied allegations of sexual abuse of Daughter, and because Daughter is mostly non-verbal, the investigation was closed as unsupported "due to insufficient evidence." DCFS recommended Vazquez enroll in sex offender treatment because he "may not understand boundaries or consent."

¶9 In October 2025, the State charged Vazquez with four counts of aggravated sexual abuse of a child, first-degree felonies, and moved for pretrial detention (Motion). In support of its Motion, the State presented Maria's and Sophia's CJC interviews, their medical reports, and the DCFS investigation. Vazquez submitted numerous pieces of character evidence supporting bail, including his marriage certificate, proof of his home ownership in Utah, verification of his longtime employment, four letters of support from his colleagues, and six letters of support from family members—namely Grandma, Father, a niece, and three more of Vazquez's children. Grandma said she "kn[ew] in [her] heart that [her] husband [was] innocent" and that Vazquez was "not a threat to [their] family or the community." In his letter, Father stated that Vazquez was "not a criminal" and was "not a danger to [their] family or the community." The letters from Vazquez's three other children and niece voiced similar support for Vazquez and a

shared belief that he was not a threat to the family or the community.

¶10 At the hearing on the Motion, Mother testified in support of the State. She said she had seen "a night-and-day difference in both [Maria] and [Sophia]" since Vazquez's arrest; they were more relaxed, and many of the behavioral shifts she and others had previously noticed had begun to resolve. Additionally, she voiced concern over Vazquez being a potential flight risk as his nephew had recently fled to Mexico to avoid legal trouble and she understood that "members of [their] family" aided this flight. The State also proffered that family members informed the State that Vazquez owns property in Mexico, "frequently visits the country," and has family that lives there.

¶11 The State argued Vazquez should be denied bail because there was substantial evidence to support his felony charges and there was clear and convincing evidence that he posed a substantial danger to others or was a flight risk. Regarding the substantial evidence of his crimes, the State argued that the children's thorough, consistent, and repeated disclosures; the behavioral changes observed by Teacher, Mother, and Father; Brother's interview; and the similarities between the abuse described by Maria and Sophia all worked together to constitute substantial evidence of the charges. The State further argued that Vazquez primarily posed "a psychological and emotional danger" to Maria and Sophia. It also highlighted the concerning nature of the DCFS investigation regarding Daughter and Vazquez's danger to her since she cannot verbalize abuse. The State highlighted that less restrictive conditions of release would not mitigate these concerns because the alleged abuse occurred while others were in the house and location monitoring would not show who Vazquez was with, only where he was located. Finally, the State argued Vazquez's ties to Mexico showed he was a potential flight risk, including owning property, having family, and frequently visiting there.

¶12 Vazquez argued that the lack of a confession, eyewitness testimony, or DNA evidence meant this case fell short of the substantial evidence requirement. Vazquez also pointed to the closed DCFS investigation, his compliance and cooperation with the criminal investigation, his lack of criminal history, and his family support (specifically, the support from Father) as proof that Vazquez did not pose a substantial danger to others. Further, Vazquez contended his employment history, home ownership, and longstanding familial relationships in Utah showed stability and did not support a finding that he was a flight risk.

¶13 At the end of the hearing, the district court found "that there is substantial evidence to support the charges" and found, "by clear and convincing evidence, that [Vazquez] would constitute a substantial danger to the other individuals or to the community after considering available conditions of release that the [c]ourt may impose if [he] is released on bail." Accordingly, the court ordered Vazquez held without bail pending trial.

ISSUES AND STANDARDS OF REVIEW

¶14 Vazquez challenges the district court's findings that (1) substantial evidence supported his charges and (2) he posed a substantial danger to others or was a flight risk. We review "a district court's ultimate determination that substantial evidence exists to support the charge[s]" de novo and overturn factual findings made in support of that decision "only when they are clearly erroneous." *Randolph v. State*, 2022 UT 34, ¶ 44, 515 P.3d 444. "A district court's determination that there is clear and convincing evidence that the defendant is a substantial danger or likely to flee if released is a fact-intensive, credibility-assessment-dependent inquiry that deserves deference. We reverse that determination only if it is clearly erroneous." *Id.* ¶ 49.

¶15 Vazquez also argues the district court incorrectly interpreted Utah Code section 77-20-201's (Section 201) definition

of substantial danger to impermissibly include emotional and psychological danger. We review issues of statutory interpretation for correctness. *See Bearden v. Croft*, 2001 UT 76, ¶ 5, 31 P.3d 537.

ANALYSIS

¶16    Under Utah law, "an individual charged with, or arrested for, a criminal offense shall be admitted to bail as a matter of right," with certain exceptions. Utah Code § 77-20-201(1). As applicable here, one such exception is when an individual is charged with

> a felony when there is substantial evidence to support the charge and the court finds, by clear and convincing evidence, that:
>
> > (i) the individual would constitute a substantial danger to any other individual or to the community after considering available conditions of release that the court may impose if the individual is released on bail; or
> >
> > (ii) the individual is likely to flee the jurisdiction of the court if the individual is released on bail . . . .

*Id.* § 77-20-201(1)(c).

¶17    Therefore, to deny Vazquez bail, the district court was required to find that (1) substantial evidence supported the charges and (2) he posed a substantial danger to others or was a flight risk. *See id.* The court's findings, though sparse, did find

each of these requirements was present. Vazquez challenges both of these findings.[4]

### I. Substantial Evidence

¶18   "The substantial evidence standard is met when the prosecution presents evidence capable of supporting a jury finding that the defendant is guilty beyond a reasonable doubt." *Randolph v. State*, 2022 UT 34, ¶ 73, 515 P.3d 444. Vazquez argues "the State did not demonstrate substantial evidence to support charging . . . [him] with aggravated sexual abuse of a child." Vazquez contends the State fell short of meeting the substantial evidence standard because "[t]he charges are based *exclusively* on the alleged statements provided by the two minor-victims" and there is no "DNA evidence, eyewitness testimony, or confession."

---

4. Vazquez failed to comply with the Utah Rules of Appellate Procedure because his principal memorandum contained no citations to the record. *See* Utah R. App. P. 10(d)(2)(C) (requiring a party's principal memorandum to include "an argument . . . supported by citations to legal authority and the record"). We are cognizant of the time-sensitive nature of this particular type of appeal and therefore do not fault Vazquez for filing his principal memorandum before the transcript of the hearing was available. But in such circumstances, to comply with rule 10(d)(2)(C), parties are required to file a corrected memorandum once the record becomes available to incorporate the appropriate record citations. Here, the transcript of the hearing became available the day after Vazquez filed his principal memorandum. Yet Vazquez did not file a corrected memorandum, nor did his reply memorandum include any record citations. Having reviewed the full transcript ourselves, we have identified representations in Vazquez's principal memorandum that do not comport with the record. We thus take this opportunity to remind all counsel of their obligation to comply with the Utah Rules of Appellate Procedure.

¶19     In support of his argument, Vazquez points to *State v. Jennings*, where our supreme court concluded the substantial evidence standard had been met where the State presented direct statements from the defendant along with physical evidence. 2025 UT 1, ¶¶ 38–45, 565 P.3d 523. But the defendant in *Jennings* was charged with first-degree murder, and there was a crime scene full of physical evidence and a clearly deceased victim. *See id.* ¶ 4. It follows that the State would present physical evidence in that context to meet the burden of substantial evidence. In cases regarding sexual crimes, by contrast, physical evidence is not always available, and statements from alleged victims alone are strong enough to constitute substantial evidence. *See, e.g., State v. Skinner*, 2020 UT App 3, ¶ 39, 457 P.3d 421 (noting that one witness's testimony was "sufficient to support the conviction").

¶20     For example, in *Randolph v. State*, the defendant was charged with "four first-degree felonies connected to an alleged sexual assault." 2022 UT 34, ¶ 1. The court denied him bail and he appealed, arguing (as Vazquez does here) that the State had not presented substantial evidence of his charges. *Id.* ¶ 76. The evidence before the court included the victim's statement, police reports, and medical documents. *Id.* ¶¶ 7, 9. The supreme court determined that, "at the very most, [the defendant's] evidence pokes holes in the State's claim. . . . But poked holes do not demand that the district court conclude that the substantial evidence standard has not been satisfied." *Id.* ¶ 80. The court concluded "the State's evidence [was] sufficient . . . to support" a finding of substantial evidence. *Id.*

¶21     Similarly here, the State presented Maria's and Sophia's CJC interviews and their medical reports. Although the medical reports do not indicate any injuries to either Maria or Sophia, they also did "not rule out the possibility of sexual abuse or discount [the] disclosure." Additionally, the disclosures from both girls were supported and corroborated. Maria's and Sophia's allegations contained numerous similarities, namely how the

abuse would begin with innocuous touching (like rubbing their backs), would occur at Vazquez's house while others were present in the house, and would consist largely of Vazquez touching their genitals under their clothes. Maria and Sophia reported this abuse in numerous ways and were consistent in their accounts. These disclosures included the note to Mother and Father, the interviews at the CJC, the disclosures during their medical exams, and the disclosure to Brother. Moreover, Brother corroborated Sophia's report of abuse when they had been watching television in Vazquez's house, noting he saw Vazquez "rubbing [Sophia's] back under her shirt" and "breathing hard." The evidence before the district court also contained corroboration of behavioral changes in Maria and Sophia from Mother, Father, and Teacher.

¶22    Even though Vazquez made a "forceful denial" of the allegations, the evidence presented by the State "provide[d] a reasonable basis for a guilty jury verdict." *Id.* ¶ 73. Accordingly, the court's finding that there was substantial evidence to support the charges against Vazquez is not clearly erroneous.

## II. Substantial Danger or Flight Risk

¶23    In order to deny bail, the district court must find that either (A) "the individual would constitute a substantial danger to any other individual or to the community after considering available conditions of release that the court may impose if the individual is released on bail" or (B) "the individual is likely to flee the jurisdiction of the court if the individual is released on bail." Utah Code § 77-20-201(1)(c)(i)–(ii).

### A.    Substantial Danger

¶24    Vazquez challenges both the district court's interpretation of "substantial danger" in Section 201 and the evidentiary support for a finding that he constitutes a substantial danger. We first address the question of statutory interpretation, then apply the interpretation to Vazquez's case.

1.     Statutory Interpretation

¶25     Vazquez contends the definition of "substantial danger" as used in Section 201 does not include psychological and emotional danger. To support his interpretation of the statutory language, he points out that Utah Code section 77-20-301 (Section 301)—the statute governing postconviction release prior to imposition of a sentence—defines "danger" to include "psychological" danger whereas Section 201 does not. *Contrast* Utah Code § 77-20-301(1)(b), *with id.* § 77-20-201(1)(c)(i). He argues this is a meaningful omission and the lack of the term "psychological" in Section 201 means that psychological and emotional danger are not to be considered in the court's analysis. We disagree with his interpretation of the statute.

¶26     "In interpreting statutory language, our primary goal is to give effect to the legislature's intent. To accomplish this goal, we begin by looking to the statute's plain language." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 33, 267 P.3d 863. While we "seek to give effect to omissions in statutory language by presuming all omissions to be purposeful," the overall statutory scheme and context also inform our interpretation. *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984. Here, it does not follow that the use of the term "psychological" danger in Section 301 means that it is excluded from the term "substantial danger" in Section 201.

¶27     First, the two sections are framed in opposition to one another. Section 201 requires the court to affirmatively find "the individual would constitute a substantial danger to any other individual or to the community," while Section 301 requires the court to find "the defendant . . . will not pose a danger to . . . any other person or the community if released." *Compare* Utah Code § 77-20-201(1)(c)(i), *with id.* § 77-20-301(1). The two sections do not ask the court to make the same finding. Rather, the court is required to make the inverse finding in each section. Thus, the

enumeration of specific types of danger in one section does not automatically mean that the lack of such enumeration in a different section of the statute was intended to exclude those types of danger.

¶28 Second, Section 301 thoroughly defines the kind of danger the court is to consider, while Section 201 is entirely silent on the matter. Section 301 asks the court to find that the defendant "will not pose a danger to the *physical, psychological, or financial and economic safety or well-being* of any other person or the community if released." *Id.* § 77-20-301(1)(b) (emphasis added). By contrast, Section 201 instructs the court to consider whether "the individual would constitute a substantial danger to any other individual or to the community." *Id.* § 77-20-201(1)(c)(i). Simply put, Section 301 enumerates all the types of danger the court is to consider, while Section 201 does not specifically define the danger in any way.

¶29 Third, were we to adopt Vazquez's interpretation of Section 201, it would lead to a nonsensical result. If we presume the omission of "psychological" from Section 201 was intentional, we would also need to exclude "physical," "financial," and "economic" from Section 201 because those types of danger are likewise enumerated in Section 301 but are not included in Section 201. *See id.* § 77-20-201(1)(c)(i), -301(1)(b). This leaves no commonly understood type of danger to consider in an analysis under Section 201 and would render "substantial danger" unnecessarily ambiguous and nearly meaningless. As recognized by our supreme court, statutory interpretations "which render some part of a [statute] nonsensical" are to be avoided. *Jackson v. Mateus*, 2003 UT 18, ¶ 21, 70 P.3d 78 (cleaned up).

¶30 Therefore, in accordance with the plain language of Section 201, we conclude that "substantial danger" encompasses various types of danger, including "physical, psychological, or financial and economic" danger, as later enumerated in Section 301. *See* Utah Code § 77-20-201(1)(c)(i), -301(1)(b). Accordingly, the district

court did not err in considering emotional and psychological danger when finding Vazquez was a substantial danger to others.[5]

2.      Evidentiary Support

¶31     Vazquez argues he is not a substantial danger to others and the district court clearly erred in so finding. To support his position, he points to his lack of criminal history, his employment history, his character recommendations, the lack of medical evidence of abuse, his compliance with the investigation, and the closure of the DCFS case regarding Daughter. But the district court had ample evidence before it that Vazquez posed a substantial danger to Maria, Sophia, and Daughter and that he also posed a substantial danger to the community where there was evidence of abuse of multiple children.

¶32     Regarding Maria and Sophia, the alleged abuse took place in Vazquez's house while others were present, indicating the presence of others in the house was not enough of a deterrent to prevent such actions. The support of numerous family members for Vazquez, including Grandma and Father, also indicated that family members may not believe the children and would not be vigilant in preventing situations similar to those that led to the alleged abuse. And while the DCFS investigation regarding Daughter was closed as unsupported, this was largely because Daughter could not sufficiently verbalize any abuse she sustained. The disclosures Daughter did make—her drawing of a

---

5. The State argued Vazquez posed "a psychological and emotional danger" to Maria and Sophia. But the district court did not specify the type of danger it relied on when it found Vazquez was a substantial danger to other individuals or to the community. Based upon our statutory analysis above, a district court can consider any type of danger in making its finding of substantial danger. *See* Utah Code § 77-20-201(1)(c)(i).

man on top of her in bed and saying "Papa" while pointing at her buttocks, belly button, and vagina, and grabbing her breasts—were highly concerning.

¶33 This same evidence also supports the district court's finding that conditions for pretrial release would be inappropriate. The abuse happened while other people were present, Maria and Sophia do not have strong familial support aside from Mother to keep them safe, and Daughter would not be able to report any abuse. Thus, release conditions such as ankle monitors or travel restrictions would not have mitigated the risk of harm.

¶34 Vazquez has thus failed to demonstrate that the district court's determination that he was a substantial danger was "clearly erroneous such that no reasonable factfinder could review the evidence presented and arrive at the disputed finding." *Ream v. Ream*, 2025 UT App 105, ¶ 36, 575 P.3d 1221 (cleaned up). Accordingly, we conclude the district court's determination that the evidence clearly and convincingly showed that Vazquez was a substantial danger to others was not clearly erroneous.

B.    Flight Risk

¶35 Vazquez also contends he does not pose a flight risk and the court could not correctly find him to be one.[6] If Vazquez was not found to be a substantial danger to others, he could still be denied bail if the court found "by clear and convincing evidence" he was "likely to flee the jurisdiction of the court if . . . released on bail." Utah Code § 77-20-201(1)(c)(ii).

---

6. The district court did not specifically find Vazquez to be a flight risk. However, both Vazquez and the State fully presented this issue to the district court and to us on appeal. We therefore address the parties' arguments on the merits.

¶36   Vazquez argues he "possesses strong family ties to the local community, maintains a fixed address, . . . and has a history of consistent and stable employment," all of which render any perceived benefit of fleeing far outweighed by the potential disruption such a flight would bring. He cites his cooperation with the investigation and compliance with prior court orders as further support for this conclusion. However, the State correctly highlights the "big difference [between] cooperating with a DCFS investigation in reunification and being charged with four first-degree felonies that carry life sentences."

¶37   At this point, the stakes are higher and the incentives to flee have increased. Vazquez's strong connections out of the country (namely, his ownership of property in Mexico, his family living there, and his frequent visits to the country) and Mother's testimony that family recently helped Vazquez's nephew flee to Mexico to evade law enforcement clearly and convincingly demonstrate that Vazquez is a flight risk. *See generally Scott v. Scott*, 2017 UT 66, ¶ 18, 423 P.3d 1275 ("We have the ability to affirm a decision on any ground apparent on the record[,] . . . even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action.").

CONCLUSION

¶38   We agree with the district court's determination that substantial evidence supported the charges. The district court's finding that Vazquez posed a substantial danger was not clearly erroneous. Further, the evidence clearly and convincingly supported that Vazquez is a flight risk. We affirm the court's denial of bail.

─────────